**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **SIERRA CLUB,** <br><br> *Plaintiff* <br><br> **vs.** <br><br> **UNITED STATES FEDERAL HIGHWAY ADMINISTRATION; JANICE W. BROWN, IN HER OFFICIAL CAPACITY AS DIVISION ADMINISTRATOR OF THE FEDERAL HIGHWAY ADMINISTRATION, TEXAS DIVISION; JEFFREY F. PANIATI, P.E., IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE FEDERAL HIGHWAY ADMINISTRATION; UNITED STATES DEPARTMENT OF TRANSPORTATION; RAY LaHOOD, IN HIS OFFICIAL CAPACITY AS SECRETARY OF TRANSPORTATION OF THE UNITED STATES DEPARTMENT OF TRANSPORTATION; TEXAS TRANSPORTATION COMMISSION; AND DEIRDRE DELISI, IN HER OFFICIAL CAPACITY AS CHAIR OF THE TEXAS TRANSPORTATION COMMISSION,** <br><br> *Defendants.* | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | **CIVIL ACTION NO._____** |

**ORIGINAL COMPLAINT**

Comes Now the Sierra Club, Plaintiff herein, complaining of the United States

Federal Highway Administration; the Division Administrator of the Texas Division of the

Federal Highway Administration, Janice W. Brown; the Federal Highway Administration

Administrator Jeffrey F. Paniati, P.E.; United States Department of Transportation; Ray

1

LaHood, Secretary of Transportation of the United States Department of Transportation;

Texas Transportation Commission; and Deirdre Delisi, Chair of the Texas Transportation

Commission, Defendants herein, and for cause of action would respectfully show the

following:

## I.    INTRODUCTION

1.    This is a civil action brought by Sierra Club for injunctive and other relief

pursuant to the provisions of the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 701-706, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §

4321 *et seq.* and its implementing regulations.

2.    This litigation arises from the decisions by the United States Federal Highway

Administration ("FHWA") and the Texas Transportation Commission("TTC")/

Texas Department of Transportation ("TxDOT") to construct a new State

Highway, known as "Grand Parkway":  a 170-mile roadway loop around the

Houston metropolitan area.

3.    This litigation relates to one segment of Grand Parkway, "Segment E."  Segment

E is proposed to be a four-lane section, beginning at Interstate Highway 10 and

ending at United States Highway 290, northwest of Houston, Texas, in Harris

County.

4.    This lawsuit was filed to challenge the arbitrary and capricious and illegal actions

by a group of governmental agencies over the procedural requirements of NEPA

and the constraint on arbitrary and capricious decision-making found in the APA.

5.      This lawsuit is filed in an attempt to protect the health and well-being of those persons living adjacent to this proposed highway.

6.      This lawsuit alleges that the FHWA has violated NEPA and the federal APA in several respects.

7.      Plaintiff Sierra Club consists of persons adversely affected or aggrieved by federal agency action within the meaning of section 702 of the Administrative Procedure Act.

## II.    JURISDICTION

8.      This action arises under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and its implementing regulations, particularly those of the Council on Environmental Quality found at 40 C.F.R. § 1500 *et seq.* as well as those of the Federal Highway Administration, 23 C.F.R. § 771 *et. seq.*  This Court also has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction); 5 U.S.C. § 702 (Administrative Procedure Act); and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. § 2202 (declaratory and injunctive relief).

## III.   VENUE

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e) because the cause of action arises in this venue; that is, the location of the property where the proposed Segment E is to be located is within this district.

## IV.   PARTIES

### A.   PLAINTIFF

10.   Plaintiff Sierra Club is a national nonprofit environmental organization with its national headquarters located at 85 Second Street, 2nd Floor, San Francisco, CA 94105.

### B.   DEFENDANTS

11.   The United States Federal Highway Administration is an agency of the United States charged with developing the road transportation systems of the United States in compliance with various statutes, including the National Environmental Policy Act and may be served at the 1200 New Jersey Ave., S.E., Washington, DC 20590.

12.   Janice W. Brown is sued in her official capacity as Division Administrator of the Texas Division of the Federal Highway Administration and may be served at the Federal Office Building, 300 East Eighth Street, Room 826, Austin, Texas 78701-3233.

13.   Jeffrey F. Paniati, P.E., is sued in his official capacity as Acting Administrator of the United States Federal Highway Administration and may be served at the 1200 New Jersey Ave., S.E., Washington, DC 20590.

14.   United States Department of Transportation is an agency of the United States of which the United States Federal Highway Administration is a part, and may be served at 400 Seventh Street, S.W., S10 Room 10206, Washington, D.C. 20590.

15.   Ray LaHood is sued in his official capacity as Secretary of Transportation of the
      United States Department of Transportation and may be served at 1200 New
      Jersey Ave., S.E., Washington, DC 20590.

16.   Texas Transportation Commission is a state agency of the State of Texas and may
      be served at 125 E. 11th Street, Austin, Texas 78701-2483.

17.   Deirdre Delisi is sued in her official capacity as Chair of the Texas Transportation
      Commission and may be served at 125 E. 11th Street, Austin, Texas 78701-2483.

## V.    STANDING

18.   Plaintiff Sierra Club is a national nonprofit environmental organization with its
      national headquarters located at 85 Second Street, 2nd Floor, San Francisco, CA
      94105.

19.   Among its corporate purposes are to practice and promote the responsible use of
      the earth's ecosystems and resources, to educate and enlist humanity to protect and
      restore the quality of the natural and human environment, and to use all lawful
      means to carry out these objectives.

20.   The Sierra Club has established a National Clean Water Campaign to protect and
      restore the quality of our nation's waters and wetlands program.

21.   The goals of the Sierra Club wetland protection program are to protect families
      from flooding, protect habitats that store floodwater and filter pollutants, and
      educate citizens on the hazards of building in floodplains.

22.   In order to pursue these goals of wetland protection, the Sierra Club relies upon the regulatory program of the U.S. Army Corps of Engineers under § 404 of the Clear Water Act.

23.   The extent of wetlands protection by this program is determined in part by the extent of the 100-year floodplain.

24.   Sierra Club members live and recreate near the proposed Segment E of the Grand Parkway.

25.   The Sierra Club has made protection of the Katy Prairie, where the proposed Grand Parkway, Segment E, is proposed, one of its highest priorities for over 20 years.

26.   In particular members of the Houston Sierra Club visit the Katy Prairie to bird, observe nature, photograph, hike, enjoy scenic beauty, experience solitude and quiet, enjoy natural sounds, recreate, and to conduct environmental education and nature study.

27.   The Sierra Club and its members support the Katy Prairie Conservancy with funds and political support for its efforts to buy land for the protection and restoration of a tall grass prairie that is a vanishing ecosystem in North America.

28.   The Sierra Club leads outings to Katy Prairie to view Bald Eagles, geese, ducks, songbirds, herons, egrets, and other migratory waterfowl and to learn about the ecological value of this area including wetlands and streams like Cypress Creek. The Katy Prairie is a home for hundreds of thousands of geese, ducks, herons, egrets, songbirds, and other wildlife.

29.    Sierra Club members benefit from protection of the Katy Prairie because it is a giant sponge that soaks up flood waters and detains and keeps those waters from flowing down Buffalo Bayou where they would cause floods and havoc downstream.  In other words, the Katy Prairie is Houston's biggest detention basin provided by Nature.

30.    The importance of parks and open space, wildlife habitat, flood control, and beautiful landscapes are quality of life issues that Sierra Club members seek to protect and which the proposed Grand Parkway has the potential to destroy.

31.    The Katy Prairie provides Sierra Club members with clean air (oxygen) and is a carbon sink, which helps buffer climate change gas production.

## VI.    FACTS

32.    State Highway 99 or the Grand Parkway is a proposed 180-plus mile circumferential highway traversing seven counties and encircling the Greater Houston region.

33.    This project has been shown on governmental planning documents since the early 1960s.

34.    Segment E of the project is approximately 13.95 miles long, beginning at IH 10 and ending at US 290.

35.    TxDOT and FHWA first filed a Notice of Intent for Segment E in 1993, notifying the public that an agency was preparing an Environmental Impact Statement ("EIS").

36.    This project has been a controversial one, opposed by many because of the significant environmental impacts.

37.    For instance, representatives of the Texas Parks and Wildlife Department, the U.S. Fish and Wildlife Service and the U.S. Army Corps of Engineers were particularly concerned with the identification and avoidance of wetlands; floodplains; rare, threatened, and endangered, or otherwise protected species; and special habitat areas such as remnant prairie and bottomland hardwoods.

38.    A Draft Environmental Impact Statement on this project was released for public review and comment by FHWA.

39.    A Final Environmental Impact Statement ("FEIS") was issued by FHWA in November 2007.

40.    A Record of Decision, a final agency action, was issued by FHWA on June 24, 2008.

41.    Sierra Club submitted extensive comments in response to both the Draft EIS and the Final EIS.

42.    In addition to the extensive comments that Sierra Club submitted, Sierra Club also filed litigation against the Federal Emergency Management Agency, concerning the publication of an erroneous FEMA flood map for Cypress Creek and Little Cypress Creek, which are west of US 290.  That litigation remains pending.

43.    By its comments and this litigation, Sierra Club contends that Defendants violated NEPA statutory and regulatory requirements, and their final decision was

arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

### VII.   NEPA AND IMPLEMENTING REGULATIONS

44.   "NEPA . . . makes environmental protection a part of the mandate of every federal agency and department," Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, 449 F.2d 1109, 1112 (D.C.Cir. 1971).  Perhaps the greatest importance of NEPA is to require…agencies to *consider* environmental issues just as they consider other matters within their mandates." Id.  (Emphasis in original.)   NEPA's essential purpose is "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  40 C.F.R. § 1500.1 (c).  The Council on Environmental Quality ("CEQ") – an agency within the Executive Office of the President – has promulgated regulations implementing NEPA.  See 40 C.F.R. §§ 1500-1508.

45.   To accomplish its purpose, NEPA requires that all agencies of the federal government must prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment . . .." 42 U.S.C. § 4332(2)(C).   This statement, known as an Environmental Impact Statement ("EIS"), must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) any "alternatives to the proposed action," and

(4) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." Id.

46.    "Major Federal actions" requiring preparation of an EIS include "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies . . .."  40 C.F.R. § 1508.18(a).

47.    Section 102(2)(E) of NEPA requires that every agency must also "study, develop, and describe alternatives to recommended courses of action . . .." 42 U.S.C. § 4332(2)(E).

48.    Regulations promulgated by the CEQ to implement NEPA describe the consideration of alternatives as "the heart of the environmental impact statement." 40 C.F.R. § 1502.14.

49.    The purpose of the requirement to consider alternatives is "to insist that no major federal project should be undertaken without intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result by entirely different means." Environmental Defense Fund v. Corps of Engineers, 492 F.2d 1123, 1135 (5th Cir. 1974).

50.    "No decision is more important that delimiting what these 'reasonable alternatives' are [since] [o]ne obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." Simmons v. United States Army Corps of Engineers, 120 F.3d 664, 666 (7th Cir. 1997).

51.     NEPA and its implementing regulations impose a duty to assess, during the public EIS process, the traffic, environmental, public-health, and socio-economic impacts of the selected alternative, as well as other alternatives.   To fulfill this duty, Defendants were obligated to assess the reasonably foreseeable impacts of the alternatives on traffic, air, aquatic resources, and wildlife.   Defendants were required to analyze these impacts in several contexts—including society as a whole, the affected region, and the relevant localities—and to look beyond their defined "project area."

## VIII.   CAUSES OF ACTION

52.     The facts set forth in paragraphs 1 through 51 are adopted herein.

**Cause of Action No. 1**:  **Violation of NEPA and NEPA Regulations and APA for inadequate and unlawful alternatives analysis.**

53.     Defendants had a duty under NEPA and its implementing regulations to rigorously explore, and objectively assess, all reasonable alternatives.   In fulfillment of this duty—considered by NEPA regulations to be "the heart of the environmental impact statement"—Defendants were required to assess all reasonable alternatives in detail, allowing reviewers to evaluate their comparative merits.

54.     The FEIS eliminates viable alternatives, essentially leaving only one alternative, other than a no-build alternative.   Thus, the FEIS does not include all reasonable alternatives.

55.     Defendants' analysis failed to consider the cumulative traffic impacts of various alternatives in combination with other planned or potential projects.

56.    Defendants engaged in segmented, piecemeal planning.

57.    The Defendants' failure to consider an adequate range of alternatives to the proposal to construct Segment E of the Grand Parkway project is contrary to the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) and the Council on Environmental Quality's implementing regulations, and is arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

**Cause of Action No. 2:  Violation of NEPA, NEPA Regulations, and APA for failure to properly assess impacts on hydrology, drainage, floodways, and floodplains.**

58.    Defendants failed to accurately assess the impacts of the proposed project on hydrology, drainage, floodplains, and floodways.

59.    FHWA's floodplains assessment is intended to address floodplain regulations.

60.    The floodplain regulations require that the following be addressed and discussed for each of the proposed alternative alignments:  (a) the risk of flooding associated with the implementation of the highway facility; (b) impacts on natural and beneficial floodplain values; (c) support of incompatible development with the floodplain; and (d) measures to minimize floodplain encroachments.

61.    Floodplain regulations also require the identification of the limits of the base (100-year) floodplain.

62.    Defendants' hydrology, drainage, floodplains, and floodways assessment is not supported by quantitative information.

63.    Defendants have failed to take a hard look at floodplains issues.

64.   The hydrology, drainage, floodways, and floodplains analysis in the FEIS was based on inaccurate information and is therefore an inadequate assessment of the environmental impacts and adverse environmental effects.

65.   Sierra Club filed a lawsuit against the Federal Emergency Management Fund ("FEMA") in 2007 because the flood levels at Cypress Creek were not accurately depicted on the FEMA draft flood insurance rate map.

66.   In response, FEMA submitted a Letter of Map Revision, which is likely to result in the modification of the FEMA draft flood insurance rate map.

67.   Because the FEIS was based on the DFIRM, which is likely to be modified, FHWA should conduct a supplemental assessment.

68.   The proposed map revisions call into question the feasibility of the entire roadway as designed.

**Cause of Action No. 3:  Violation of NEPA, NEPA regulations, and APA for failing to disclose significant impacts and indirect effects on wetlands.**

69.   Defendants had a duty to identify the extent of wetlands impacted and provide alternatives for avoidance and practicable measures to minimize harm to wetlands.

70.   For adverse impacts to wetlands that cannot be avoided, other mitigation efforts must be considered.

71.   Wetlands within the Katy Prairie are known to possess international significance.

72.   Defendants have failed to disclose the full extent of the significant impacts and indirect effects that the Segment E project will have on wetlands.

73.     Moreover, Defendants failed to fully address mitigation efforts.  The lack of
        mitigation plans deprives the public of the ability to review, comment on, and
        understand the wetland mitigation options that may be available.

**Cause of Action No. 4:  Violation of NEPA, NEPA regulations, and APA for failing
to disclose significant air impacts and safety risks**

74.     Defendants failed to accurately assess the impacts of the proposed Segment E
        from air-toxics pollution.

75.     Defendants failed to assess the cumulative air quality impacts of the project in
        combination with air pollution for other sources.

76.     Defendants have failed to assemble and present necessary information and
        analyses to allow the agencies, decision-makers, and the public to understand the
        impacts of the project, and other alternatives, on air quality and the public health.

77.     NEPA imposes strict requirements on federal agencies regarding full disclosure of
        environmental impacts in an environmental impact statement.

78.     In this case, Defendants failed to fully and accurately disclose the impacts of the
        proposed action on the human environment with regard to the health effects of
        highway air pollution, including the health effects associated with living adjacent
        to a major roadway used by trucks and automobiles.

79.     NEPA requires full and fair disclosure of health impacts of the proposed action as
        set out in the regulations of the CEQ.  40 C.F.R. § 1508.8.

80.     The FEIS is deficient and inadequate in its quantitative and qualitative air quality
        assessment, evaluation, and analysis.

14

**Cause of Action No. 5:  Violation of NEPA, NEPA regulations, and APA for failing to properly disclose noise impacts.**

81.    FHWA regulations state that "[i]f a noise impact is identified, the abatement measures listed in [23 C.F.R.] § 772.13(c) of this chapter must be considered."  23 C.F.R. § 772.11.

82.    The FEIS underestimates the potential noise impacts.

83.    Defendants failed to fully consider all reasonable noise abatement measures, including noise absorbing pavement and vegetation barriers.

**Cause of Action No. 6:  Violation of NEPA, NEPA regulations, and APA for failing to consider indirect, secondary, and cumulative impacts.**

84.    CEQ regulations define "cumulative impact" at 40 C.F.R. 1508.7:  "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or persona undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."

85.    The Defendants' failure to document, analyze and consider adequately the full range of significant direct, indirect, secondary, and cumulative environmental impacts of the project in conjunction with past, present and reasonably foreseeable future actions is contrary to the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) and the Council on Environmental Quality's implementing regulations,

and is arbitrary, capricious, and an abuse of discretion, in violation of the

Administrative Procedure Act, 5 U.S.C. § 706(2).

## IX.   PLAINTIFF'S CLAIMS FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

1.     declare that Defendants' have violated NEPA, its implementing regulations, and the APA

2.     order Defendants to conduct a Supplemental Environmental Impact Statement to cure all violations of NEPA, its implementing regulations, and the APA;

3.     award plaintiff its reasonable attorneys' fees and costs for this action; and

4.     grant such other and further relief, including injunctive relief, as may be just and proper.

Respectfully submitted,

BLACKBURN CARTER, P.C.

_____/s/_____
James B. Blackburn, Jr.
Texas Bar No. 02388500
4709 Austin St.
Houston, Texas  77004
713/524-1012
713/524-5165 (facsimile)

_____/s/_____
Richard W. Lowerre
Texas Bar No. 12632900
LOWERRE, FREDERICK, PERALES,
     ALLMON & ROCKWELL
707 Rio Grande, Ste. 200
Austin, Texas 78701
(512) 469-6000
(512) 482-9346 (facsimile)

ATTORNEYS FOR PLAINTIFF

16