# TAB A

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 4549881 (N.D.Tex.)
(Cite as: 2008 WL 4549881 (N.D.Tex.))

**C**Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas,
Lubbock Division.
Monte HASIE and Hasie Financial Group, Plaintiffs,
v.
OFFICE OF the COMPTROLLER OF the CURRENCY
OF THE UNITED STATES, Defendant.
**Civil Action No. 5:07-CV-208-C ECF.**

May 9, 2008.

D. Douglas Brothers, George & Brothers, LLP, Broadus
A. Spivey, Law Offices of Broadus A. Spivey, PC, Price
L. Ainsworth, Law Office of Price Ainsworth, Austin, TX,
for Plaintiffs.

Ernest Clifford Barrett, III, US Comptroller of the
Currency, Washington, DC, for Defendant.

### ORDER

SAM R. CUMMINGS, District Judge.

*1 CAME ON FOR CONSIDERATION this day the
following motions:

(1) Defendant's Motion to Dismiss or Alternatively for
Summary Judgment, filed November 26, 2007[# 11];

(2) Plaintiffs' Cross-Motion for Summary Judgment and
Response to Defendant's Motion for Summary
Judgment, filed January 4, 2008[# 20]; and

(3) Defendant's Reply [Response] to Plaintiffs'

Cross-Motion, filed January 18, 2008[# 22].

### I.

### *PROCEDURAL BACKGROUND*

Monte Hasie and Hasie Financial Group (collectively
"Plaintiffs") filed an Original Complaint on September 24,
2007, seeking judicial review pursuant to the
Administrative Procedures Act, 5 U.S.C. §§ 701 et seq.
(herein "APA"). On September 26, 2007, Plaintiffs filed,
under seal, an Addenda to Plaintiffs' Original Complaint.
Specifically, Plaintiffs allege that the denial of Plaintiffs'
administrative request for non-public information was
unlawful, arbitrary, capricious, and an abuse of discretion.
(Pls.' Orig. Compl. 7-15.) On November 20, 2007, the
Office of the Comptroller of the Currency of the United
States ("Defendant" or "OCC") filed a Motion to Seal
Administrative Record, which was granted, and the
Original Administrative Record was filed under seal.
Defendant filed its Motion to Dismiss or Alternatively for
Summary Judgment on November 26, 2007, seeking to
dismiss all of Plaintiffs' claims as a matter of law.
Subsequently, after receiving an extension for filing a
response to Defendant's Motion, Plaintiffs filed their
Cross-Motion for Summary Judgment and Response to
Defendant's Motion on January 4, 2008, under seal.
Plaintiffs' Cross-Motion seeks an order granting judgment
in favor of Plaintiffs and against Defendant by determining
that Defendant's denial of Plaintiffs' administrative request
for non-public information be set aside. Defendant filed its
Response (titled as a Reply) to Plaintiffs' Cross-Motion on
January 18, 2008.

### II.

### *STANDARD OF REVIEW*[FN1]

FN1. Although Defendant moved for dismissal
and alternatively for summary judgment, the
Court will view Defendant's Motion as a motion
for summary judgment and analyze it in that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4549881 (N.D.Tex.)
(Cite as: 2008 WL 4549881 (N.D.Tex.))

fashion. No notice is required to Plaintiffs because they have recognized Defendant's Motion as one for summary judgment in filing their own *Cross*-Motion. Moreover, neither party can be said to raise unfair surprise because both parties have recognized the summary judgment standard as being applicable. (Def.'s Br. in Supp. Mot. at 11; Pls.' Br. in Supp. Cross-Mot. at 13); *see Girling Health Care, Inc. v. Shalala,* 85 F.3d 211, 214 (5th Cir.1996) (summary judgment standard is particularly appropriate in cases in which a court is asked to review or enforce a decision of a federal administrative agency).

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal quotations omitted). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428 (5th Cir.1996) (en banc); *SEC v. Recile,* 10 F.3d 1093, 1097 (5th Cir.1993). Furthermore, summary judgment is appropriate "where the only issue before the court is a pure question of law." *Sheline v. Dun & Bradstreet Corp.,* 948 F.2d 174, 176 (5th Cir.1991); *see also Neff v. Am. Dairy Queen Corp.,* 58 F.3d 1063, 1065 (5th Cir.1995) ("Consequently, we hold that because the disputed issue in this case is purely legal, it was appropriately resolved through summary judgment.").

*2 Additionally, the scope of judicial review of an agency action under the APA is limited in the following ways: (1) judicial review is limited to the agency record; (2) agencies are given deference in interpretation of statutes and regulations that they administer; and (3) judicial review is limited to final agency action. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Texas-Capital Contractors v. Abdnor,* 933 F.2d 261, 264 (5th Cir.1990); *Avoyelles Sportsmen's League v. Marsh,* 715 F.2d 897, 910 (5th Cir.1983); 5 U.S.C. § 704. In an

APA case, the standard of review is whether the agency decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (1996); *Camp,* 411 U.S. at 142; *Texas-Capital,* 933 F.2d at 264; *Avoyelles,* 715 F.2d at 904. A decision is arbitrary or capricious "only when it is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Wilson v. U.S. Dep't of Agric.,* 991 F.2d 1211, 1215 (5th Cir.1993) (internal quotations omitted). "The agency decision need only have a rational basis, and it does not have to be a decision which the court would have made." *Id.* The reviewing court is "not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Furthermore, the standard of review is "highly deferential" and a final agency decision is "entitled to a presumption of regularity." *Avoyelles,* 715 F.2d at 904.

### III.

### *DISCUSSION*

Plaintiffs seek the release of Suspicious Activity Reports ("SARs") allegedly drafted and/or filed by State National Bank of West Texas ("SNB"). Plaintiffs seek these documents for use in their state court civil action against SNB, in which Plaintiffs are apparently alleging that SNB improperly initiated or procured the prosecution of Plaintiff Monte Hasie. During the criminal prosecution of Monte Hasie, the Government turned over certain protected documents to Monte Hasie during discovery. Plaintiffs later produced these documents to SNB in discovery related to Plaintiffs' state court civil lawsuit against SNB. SNB apparently notified the OCC that Plaintiffs were in possession of non-public documents. The OCC convinced Plaintiffs to return the documents, including all copies, and to submit a formal request for them. Plaintiffs submitted such a request and were denied. Plaintiffs argue that the OCC acted in an arbitrary and capricious manner not in accordance with the law when it denied Plaintiffs' request to release certain SARs to Plaintiffs for use in their state court civil proceeding. Plaintiffs seek an order from this Court finding that the OCC erred and requiring the OCC to make the SARs available to the Plaintiffs.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4549881 (N.D.Tex.)
(Cite as: 2008 WL 4549881 (N.D.Tex.))

In the Bank Secrecy Act ("BSA"), Congress determined that SARs are confidential and that government officials are prohibited from disclosing SARs to the subject of the report except when necessary to fulfill the official duties of such an employee. 31 U.S.C. § 5318(g). In a final agency decision, the OCC determined that Plaintiffs' request for the documents should be denied because Plaintiffs had failed to make sufficient showings of relevance and need balanced against the public interest in maintaining confidentiality in reporting suspicious activity by banks. The OCC relied upon its regulations governing access by private litigants to confidential and privileged information. 12 C.F.R. §§ 4.31 et seq . The OCC's decision of whether to release non-public information is based upon a weighing of all appropriate factors, 12 C.F.R. § 4.35(a), including those enumerated in 12 C.F.R. § 4.33, which requires that the request include information to apprise the OCC of the nature of the litigation for which the documents are sought. 12 C.F.R. § 4.33(a)(3)(ii). The request should also make a showing "that the information is relevant to the purpose for which it is sought;" that "other evidence reasonably suited to the requester's needs is not available from any other source;" and that "the need for the information outweighs the public interest considerations in maintaining the confidentiality of the OCC information and outweighs the burden on the OCC to produce the information." 12 C.F.R. § 4.33(a)(3)(iii)(A)-(C).

*3 On July 13, 2007, the OCC denied Plaintiffs' request in a 5-page decision (AR Tab 12 at 287-291), determining that Plaintiffs had made inadequate showings under the relevance factor, 12 C.F.R. § 4.33(A)(3)(iii), and under the factor balancing the requester's need for information against the public interest considerations in maintaining the information's confidentiality. Id. at § 4.33(a) (3)(iii)(C). Specifically, the OCC determined that the First Circuit's opinion in Stoutt v. Banco Popular de Puerto Rico, 320 F.3d 26 (1st Cir.2003), precluded Plaintiffs' request because good faith is not required in order for a bank to enjoy the protections afforded in the safe harbor provision protecting reporting banks from liability. 31 U.S.C. § 5318(g)(3); 12 C.F.R. § 21.11(1). There being no Fifth Circuit decision directly on point, the OCC evidently relied upon the First Circuit precedence and a case from the United States District Court for the Southern District of Texas, Whitney National Bank v. Karam, 306 F.Supp.2d 678, 682 (S.D.Tex.2004), finding that the safe harbor provisions and the prohibition on disclosure make

the information sought irrelevant. The OCC also determined that Plaintiffs had failed to show that their need for the information outweighed the public considerations in maintaining the information's confidentiality. 12 C.F.R. § 4.33(a)(3)(iii)(C). The OCC concluded that Plaintiffs could gather evidence by way of SNB employees' testimony and the 15 boxes of SNB records produced in discovery in the state court litigation. The OCC went on to discuss the dangers of disclosure and public policy considerations supporting confidentiality.

Finally, the OCC concluded that because the SARs are privileged under statute, regulation, and policy, the United States Attorney's Office could not have waived privilege when it produced documents in the criminal proceedings against Plaintiff Monte Hasie. The OCC determined that the SARs are non-public information and the property of the Comptroller. Thus, the OCC found that the Plaintiffs' possession of the documents for the criminal proceeding did not waive the OCC's right to control the subsequent use of the SARs for civil litigation.

As properly argued by Defendant, the sole issue before this Court is whether, pursuant to the APA, the OCC's decision denying Plaintiffs' request for non-public information was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Defendant argues, and points to various documents in the Administrative Record in support thereof, that its decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The Court, after reviewing the Administrative Record and both parties' Briefs and supporting materials, agrees with Defendant. The question is not whether this Court may have reached a different decision but, under a highly deferential review, whether the decision was so implausible that it could not be ascribed to be a difference in view or the product of agency expertise, and that it have a rational basis. Wilson v. U.S. Dep't of Agric., 991 F.2d 1211, 1215 (5th Cir.1993); 5 U.S.C. § 706(2)(A) (1996); Camp, 411 U.S. at 142; Texas-Capital, 933 F.2d at 264; Avoyelles, 715 F.2d at 904.

*4 Consequently, for the reasons articulated in Defendant's (1) Brief in Support of its Motion for Summary Judgment and (2) Reply [Response] to Plaintiffs' Motion for Summary Judgment, Defendant is entitled to judgment as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4549881 (N.D.Tex.)
(Cite as: 2008 WL 4549881 (N.D.Tex.))

a matter of law. The Court finds, as a matter of law, that
the OCC's decision was not arbitrary, capricious, an abuse
of discretion, or otherwise not in accordance with law. The
Court further finds that the OCC gave reasoned
consideration to Plaintiffs' request and determined that
Plaintiffs had not met their burden after considering the
relevant factors and reasons for the request.

## IV.

### *CONCLUSION*

The Court, for the reasons articulated herein, hereby
ORDERS that Defendant's Motion to Dismiss or
Alternatively for Summary Judgment [# 11] be
**GRANTED** and Plaintiffs' Cross-Motion for Summary
Judgment [# 20] be **DENIED.**

SO ORDERED.

N.D.Tex.,2008.
Hasie v. Office of Comptroller of Currency of U.S.
Not Reported in F.Supp.2d, 2008 WL 4549881
(N.D.Tex.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Westlaw.

Date of Printing: Jan 20, 2010

## KEYCITE

**C**<u>Hasie v. Office of Comptroller of Currency of U.S.</u>, **2008 WL 4549881 (N.D.Tex.,May 09, 2008) (NO. 5:07-CV-208-C)**

### History
### Direct History

=>    <u>1</u>  **Hasie v. Office of Comptroller of Currency of U.S.,** 2008 WL 4549881 (N.D.Tex. May 09, 2008) (NO. 5:07-CV-208-C)

### Court Documents
### Trial Court Documents (U.S.A.)

**N.D.Tex. Trial Pleadings**
    <u>2</u>  Monte HASIE and Hasie Financial Group, Plaintiffs, v. OFFICE OF THE COMPTROLLER OF THE CURRENCY OF THE UNITED STATES, Defendant., 2007 WL 3311850 (Trial Pleading) (N.D.Tex. Sep. 24, 2007) **Plaintiffs' Original Complaint for Judicial Review Pursuant to the Administrative Procedure Act, 5 U.S.C. | 701, et Seq.** (NO. 5-07CV0208-C)

**N.D.Tex. Trial Motions, Memoranda And Affidavits**
    <u>3</u>  MONTE HASIE AND HASIE FINANCIAL GROUP, Plaintiffs, v. OFFICE OF THE COMPTROLLER OF THE CURRENCY OF THE UNITED STATES Defendant., 2007 WL 4825137 (Trial Motion, Memorandum and Affidavit) (N.D.Tex. Nov. 26, 2007) **Memorandum in Support of Defendant's Motion to Dismiss or Alternatively for Summary Judgment** (NO. 507-CV-208-C)

### Dockets (U.S.A.)

**N.D.Tex.**
    <u>4</u>  HASIE ET AL v. OFFICE OF THE COMPTROLLER OF THE CURRENCY OF THE UNITED STATES, NO. 5:07cv00208 (Docket) (N.D.Tex. Sep. 24, 2007)

© 2010 Thomson Reuters. All rights reserved.

# TAB B

Westlaw.

207 Fed.Appx. 379, 2006 WL 3337454 (C.A.5 (La.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 207 Fed.Appx. 379, 2006 WL 3337454 (C.A.5 (La.)))

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4. (Find CTA5 Rule 28 and Find CTA5 Rule 47)

United States Court of Appeals,
Fifth Circuit.
State of LOUISIANA, Division of Administration,
Plaintiff-Appellant,
v.
U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES; Michael O. Leavitt, Secretary of the U.S.
Department of Health and Human Services,
Defendants-Appellees.
No. 05-30927.

Nov. 17, 2006.

**Background:** State brought action for declaratory and injunctive relief with respect to two adverse decisions by federal agency, which required an immediate cash refund of certain costs associated with state-administered federal programs. The United States District Court for the Middle District of Louisiana granted summary judgment to agency. State appealed.

**Holdings:** The Court of Appeals held that:

(1) agency decisions were not arbitrary and capricious;

(2) district court was not required to explicitly state that it was reviewing the contested portions of the magistrate judge's report and recommendation de novo; and

(3) district court's deferential review of agency's rationale for its decisions was proper.

Affirmed.

West Headnotes

[1] United States 393 ⟜75.5

393 United States
   393IV Debts Due the United States; Priority
      393k75.5 k. Debts Due to United States in General. Most Cited Cases
Federal agency decisions obligating state to repay certain costs associated with state-administered federal programs that were not allowable under federal guidelines immediately in cash, as opposed to permitting state to credit the debt against future billings, and prohibiting the state from obtaining an offset for allowable costs that the state incurred but did not charge to the federal government, were not arbitrary and capricious. 5 U.S.C.A. § 706(2)(A).

[2] United States Magistrates 394 ⟜25

394 United States Magistrates
   394k24 Review and Supervision by District Court
      394k25 k. Proceedings for Review; Objection to Report. Most Cited Cases
When ruling on federal agency's motion for summary judgment in state's action for declaratory and injunctive relief from two adverse agency decisions, federal district court was not required to explicitly state that it was reviewing contested portions of magistrate judge's report and recommendation de novo.

[3] Declaratory Judgment 118A ⟜365

118A Declaratory Judgment
   118AIII Proceedings
      118AIII(F) Hearing and Determination
         118Ak365 k. Scope of Inquiry and Powers of Court. Most Cited Cases
District court's deferential review of federal agency's rationale for its decisions was proper in state's action against agency for declaratory and injunctive relief from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

207 Fed.Appx. 379, 2006 WL 3337454 (C.A.5 (La.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 207 Fed.Appx. 379, 2006 WL 3337454 (C.A.5 (La.)))

those decisions.
*379Kelly C. Blevins, Phyllis D. Thompson, Covington & Burling, Washington, DC, Pamela Miller Perkins, Division of Administration for the State of Louisiana, Baton Rouge, LA, for Plaintiff-Appellant.

Tara Avery Hingle, Assistant U.S. Attorney, U.S. Attorney's Office Middle District of Louisiana, Baton Rouge, LA, Wendy M. Keats, U.S. Department of Justice Civil Division, Washington, DC, for Defendants-Appellees.

Appeal from the United States District Court for the Middle District of Louisiana, (3:03-CV-856).

Before GARZA, DeMOSS, and STEWART, Circuit Judges.

PER CURIAM: [FN*]

> FN* Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

*380**1 The State of Louisiana, Division of Administration (the "State") appeals a decision of the district court granting summary judgment to the U.S. Department of Health and Human Services ("HHS") on the State's claims for declaratory and injunctive relief with respect to two adverse decisions rendered by HHS. We affirm.

In early September 2003, HHS determined that from 1997-2000, the State had charged the federal government for certain costs associated with state-administered federal programs that were not allowable under the relevant federal guidelines. HHS also determined that the State was not entitled to reimbursement for various allowable costs that the State had incurred but failed to bill to the federal government during the years 1989-1998.[FN1] Pursuant to

these determinations, HHS requested an immediate cash refund from the State of $19.2 million. The State appealed this decision to HHS's Departmental Appeals Board, which affirmed the agency's decision. Later, in early November 2003, HHS determined that the State owed it an additional $8.7 million for similar overages, resulting in a total debt of approximately $27.8 million. The State did not appeal this decision.[FN2]

> FN1. However, HHS allowed the State a $387,044 reimbursement for allowable costs that the State had incurred but failed to bill to the federal government during the years 1999-2000.

> FN2. However, the letter containing the decision advised the State that the decision would constitute a final decision if the State did not appeal. Accordingly, the decision was a "final agency action" subject to judicial review under 5 U.S.C. § 704.

In late November 2003, the State filed suit against HHS and its Secretary, seeking (1) a declaration that the agency's decisions were arbitrary and capricious, an abuse of discretion, and contrary to law and (2) an injunction to prevent HHS from recovering the money owed. The parties filed cross-motions for summary judgment, which were referred to a magistrate judge. The magistrate judge recommended that the court deny the State's motion for summary judgment and grant HHS's motion, reasoning that HHS's decisions were not arbitrary and capricious, an abuse of discretion, or contrary to law under the relevant standard of review. The district court adopted the magistrate's report and recommendation without opinion, granted summary judgment in HHS's favor, and entered final judgment against the State. The State timely appealed.

On appeal, we review a grant of summary judgment de novo, applying the same standard as the district court. City of Shoreacres v. Waterworth, 420 F.3d 440, 445 (5th Cir.2005). Agency decisions are reviewed under the standard set forth in the Administrative Procedures Act; therefore, we will "hold unlawful and set aside" HHS's decisions only if we determine that they were " 'arbitrary,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

207 Fed.Appx. 379, 2006 WL 3337454 (C.A.5 (La.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 207 Fed.Appx. 379, 2006 WL 3337454 (C.A.5 (La.)))

capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Id.* (quoting Administrative Procedures Act § 706(2)(A), 5 U.S.C. § 706(2)(A) (2000)). This so-called "arbitrary and capricious" standard of review is highly deferential, and it requires us to "accord the agency's decision[s] a presumption of regularity." *Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.,* 374 F.3d 362, 366 (5th Cir.2004) (internal quotation marks omitted). "[W]e are prohibited from substituting our judgment for that of the agency." *Id.* (internal quotation marks omitted). Further, to sustain an agency action, only a rational connection between the facts found and the decisions made is required, and "[i]t is **\*381** well-established that an agency's action must be upheld if at all, on the basis articulated by the agency itself." *Id. at 366-67* (internal quotation marks omitted).

**\*\*2** The State's primary argument, as we read it, is that the district court erred in upholding HHS's decisions because they were arbitrary and capricious: the decisions obligated the State to repay its debt immediately in cash-as opposed to permitting the State to credit the debt against future billings or adjust future billings to reflect the debt-and prohibited the State from obtaining an offset of $28.9 million for allowable costs that the State incurred but did not charge to the federal government. The State also argues that we should reverse the district court because the court did not conduct a *de novo* review of contested portions of the magistrate judge's report and recommendation and because the court, by adopting the magistrate judge's report and recommendation, improperly accorded great deference and controlling weight to HHS's rationale for its decisions.

[1][2][3] Having carefully reviewed the briefs, the record, and the oral argument, we affirm the decision of the district court essentially for the reasons articulated by HHS. HHS's decisions were not arbitrary and capricious. Further, we cannot agree with the State that the district court failed to conduct a *de novo* review,[FN3] and we find no error with respect to the district court's deferential review of HHS's rationale for its decisions.

> FN3. Contrary to the State's allegations on appeal, the district court had access to the administrative record. Also, there is no

requirement that the district court explicitly state that it is reviewing contested portions of a magistrate judge's report and recommendation *de novo. See Bannister v. Ullman,* 287 F.3d 394, 399 (5th Cir.2002).

AFFIRMED.

C.A.5 (La.),2006.
Louisiana v. U.S. Dept. of Health and Human Services
207 Fed.Appx. 379, 2006 WL 3337454 (C.A.5 (La.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Date of Printing: Jan 20, 2010

### KEYCITE

Louisiana v. U.S. Dept. of Health and Human Services, 207 Fed.Appx. 379 (5th Cir.(La.),Nov 17, 2006) (NO. 05 30927)

**History**
**Direct History**

=>       1 **Louisiana v. U.S. Dept. of Health and Human Services,** 207 Fed.Appx. 379 (5th Cir.(La.) Nov 17, 2006) (Not selected for publication in the Federal Reporter, NO. 05 30927)

© 2010 Thomson Reuters. All rights reserved.

TAB C

Westlaw.

23 C.F.R. § 771.107

**C**

**Effective: April 23, 2009**

Code of Federal Regulations Currentness
   Title 23. Highways
      Chapter I. Federal Highway Administration, Department of Transportation
         Subchapter H. Right–Of–Way and Environment
            Part 771. Environmental Impact and Related Procedures (Refs & Annos)

→ § 771.107 Definitions.

The definitions contained in the CEQ regulation and in Titles 23 and 49 of the United States Code are applicable. In addition, the following definitions apply.

(a) Environmental studies. The investigations of potential environmental impacts to determine the environmental process to be followed and to assist in the preparation of the environmental document.

(b) Action. A highway or transit project proposed for FHWA or FTA funding. It also includes activities such as joint and multiple use permits, changes in access control, etc., which may or may not involve a commitment of Federal funds.

(c) Administration action. The approval by FHWA or FTA of the applicant's request for Federal funds for construction. It also includes approval of activities such as joint and multiple use permits, changes in access control, etc., which may or may not involve a commitment of Federal funds.

(d) Administration. The FHWA or FTA, whichever is the designated Federal lead agency for the proposed action. A reference herein to the Administration means the State when the State is functioning as the FHWA or FTA in carrying out responsibilities delegated or assigned to the State in accordance with 23 U.S.C. 325, 326, or 327, or

other applicable law.

(e) Section 4(f). Refers to 49 U.S.C. 303 and 23 U.S.C. 138. [FN2]

> [2] Section 4(f), which protected certain public lands and all historic sites, technically was repealed in 1983 when it was codified, without substantive change, as 49 U.S.C. 303. This regulation continues to refer to section 4(f) because it would create needless confusion to do otherwise; the policies section 4(f) engendered are widely referred to as "section 4(f)" matters. A provision with the same meaning is found at 23 U.S.C. 138 and applies only to FHWA actions.

(f) Applicant. Any State, local, or federally-recognized Indian tribal governmental unit that requests funding approval or other action by the Administration and that the Administration works with to conduct environmental studies and prepare environmental review documents. When another Federal agency, or the Administration itself, is implementing the action, then the lead agencies (as defined in this regulation) may assume the responsibilities of the applicant in this part. If there is no applicant, then the Federal lead agency will assume the responsibilities of the applicant in this part.

(g) Lead agencies. The Administration and any other agency designated to serve as a joint lead agency with the Administration under 23 U.S.C. 139(c)(3) or under the CEQ regulation.

(h) Participating agency. A Federal, State, local, or federally-recognized Indian tribal governmental unit that may have an interest in the proposed project and has accepted an invitation to be a participating agency, or, in the case of a Federal agency, has not declined the invitation in accordance with 23 U.S.C. 139(d)(3).

(i) Project sponsor. The Federal, State, local, or federally-recognized Indian tribal governmental unit, or other entity, including any private or public-private entity that seeks an Administration action.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[70 FR 24469, May 9, 2005; 74 FR 12527, March 24, 2009]

SOURCE: 52 FR 32660, Aug. 28, 1987; 62 FR 6873, Feb. 14, 1997; 74 FR 12527, March 24, 2009, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321 et seq.; 23 U.S.C. 106, 109, 128, 138, 139, 315, 325, 326, and 327; 49 U.S.C. 303, 5301(e), 5323(b), and 5324; Pub.L. 109-59, 119 Stat. 1144, sections 6002 and 6010; 40 CFR parts 1500–1508; 49 CFR 1.48(b) and 1.51.

23 C. F. R. § 771.107, 23 CFR § 771.107

Current through January 8, 2010; 75 FR 1262

© 2010 Thomson Reuters
END OF DOCUMENT

TAB D

Westlaw.

23 C.F.R. § 771.109                                                                  Page 1

**C**

**Effective: April 23, 2009**

Code of Federal Regulations Currentness
  Title 23. Highways
    Chapter I. Federal Highway Administration,
    Department of Transportation
      🔲 Subchapter H. Right–Of–Way and Environment
        🔲 Part 771. Environmental Impact and Related
        Procedures (Refs & Annos)

→ **§ 771.109 Applicability and responsibilities.**

(a)(1) The provisions of this regulation and the CEQ regulation apply to actions where the Administration exercises sufficient control to condition the permit or project approval. Actions taken by the applicant which do not require Federal approvals, such as preparation of a regional transportation plan are not subject to this regulation.

(2) This regulation does not apply to, or alter approvals by the Administration made prior to the effective date of this regulation.

(3) Environmental documents accepted or prepared after the effective date of this regulation shall be developed in accordance with this regulation.

(b) It shall be the responsibility of the applicant, in cooperation with the Administration to implement those mitigation measures stated as commitments in the environmental documents prepared pursuant to this regulation. The FHWA will assure that this is accomplished as a part of its program management responsibilities that include reviews of designs, plans, specifications, and estimates (PS&E), and construction inspections. The FTA will assure implementation of committed mitigation measures through incorporation by reference in the grant agreement, followed by reviews of designs and construction inspections.

(c) The following roles and responsibilities apply during the environmental review process:

(1) The lead agencies are responsible for managing the environmental review process and the preparation of the appropriate environmental review documents.

(2) Any applicant that is a State or local governmental entity that is, or is expected to be, a direct recipient of funds under title 23, U.S. Code, or chapter 53 of title 49 U.S. Code, for the action shall serve as a joint lead agency with the Administration in accordance with 23 U.S.C. 139, and may prepare environmental review documents if the Administration furnishes guidance and independently evaluates the documents.

(3) The Administration may invite other Federal, State, local, or federally-recognized Indian tribal governmental units to serve as joint lead agencies in accordance with the CEQ regulation. If the applicant is serving as a joint lead agency under 23 U.S.C. 139(c)(3), then the Administration and the applicant will decide jointly which other agencies to invite to serve as joint lead agencies.

(4) When the applicant seeks an Administration action other than the approval of funds, the role of the applicant will be determined by the Administration in accordance with the CEQ regulation and 23 U.S.C. 139.

(5) Regardless of its role under paragraphs (c)(2) through (c)(4) of this section, a public agency that has statewide jurisdiction (for example, a State highway agency or a State department of transportation) or a local unit of government acting through a statewide agency, that meets the requirements of section 102(2)(D) of NEPA, may prepare the EIS and other environmental review documents with the Administration furnishing guidance, participating in the preparation, and independently evaluating the document. All FHWA applicants qualify under this paragraph.

(6) The role of a project sponsor that is a private

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

institution or firm is limited to providing technical studies and commenting on environmental review documents.

(d) When entering into Federal-aid project agreements pursuant to 23 U.S.C. 106, it shall be the responsibility of the State highway agency to ensure that the project is constructed in accordance with and incorporates all committed environmental impact mitigation measures listed in approved environmental review documents unless the State requests and receives written FHWA approval to modify or delete such mitigation features.

[62 FR 6873, Feb. 14, 1997; 70 FR 24469, May 9, 2005; 74 FR 12527, March 24, 2009]

SOURCE: 52 FR 32660, Aug. 28, 1987; 62 FR 6873, Feb. 14, 1997; 74 FR 12527, March 24, 2009, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321 et seq.; 23 U.S.C. 106, 109, 128, 138, 139, 315, 325, 326, and 327; 49 U.S.C. 303, 5301(e), 5323(b), and 5324; Pub.L. 109–59, 119 Stat. 1144, sections 6002 and 6010; 40 CFR parts 1500–1508; 49 CFR 1.48(b) and 1.51.

23 C. F. R. § 771.109, 23 CFR § 771.109

Current through January 8, 2010; 75 FR 1262

© 2010 Thomson Reuters
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB E

c

**Effective: April 23, 2009**

Code of Federal Regulations Currentness
  Title 23. Highways
    Chapter I. Federal Highway Administration, Department of Transportation
      ⌐▣ Subchapter H. Right–Of–Way and Environment
      ⌐▣ Part 771. Environmental Impact and Related Procedures (Refs & Annos)

→ **§ 771.111 Early coordination, public involvement, and project development.**

(a)(1) Early coordination with appropriate agencies and the public aids in determining the type of environmental review documents an action requires, the scope of the document, the level of analysis, and related environmental requirements. This involves the exchange of information from the inception of a proposal for action to preparation of the environmental review documents. Applicants intending to apply for funds should notify the Administration at the time that a project concept is identified. When requested, the Administration will advise the applicant, insofar as possible, of the probable class of action and related environmental laws and requirements and of the need for specific studies and findings which would normally be developed concurrently with the environmental review documents.

(2) The information and results produced by, or in support of, the transportation planning process may be incorporated into environmental review documents in accordance with 40 CFR 1502.21 and 23 CFR 450.212 or 450.318. [FN3]

³ On February 14, 2007, FHWA and FTA issued guidance on incorporating products of the planning process into NEPA documents as Appendix A of 23 CFR part 450. This guidance, titled "Linking the Transportation Planning and NEPA Processes," is available on the FHWA Web site at http://www.fhwa.dot.gov or in hard copy upon request.

(b) The Administration will identify the probable class of action as soon as sufficient information is available to identify the probable impacts of the action.

(c) When both the FHWA and FTA are involved in the development of a project, or when the FHWA or FTA acts as a joint lead agency with another Federal agency, a mutually acceptable process will be established on a case-by-case basis.

(d) During the early coordination process, the lead agencies may request other agencies having an interest in the action to participate, and must invite such agencies if the action is subject to the project development procedures in 23 U.S.C. 139. [FN4] Agencies with special expertise may be invited to become cooperating agencies. Agencies with jurisdiction by law must be requested to become cooperating agencies.

⁴ The FHWA and FTA have developed guidance on 23 U.S.C. Section 139 titled "SAFETEA–LU Environmental Review Process: Final Guidance," November 15, 2006, and available at http://www.fhwa.dot.gov or in hard copy upon request.

(e) Other States, and Federal land management entities, that may be significantly affected by the action or by any of the alternatives shall be notified early and their views solicited by the applicant in cooperation with the Administration. The Administration will prepare a written evaluation of any significant unresolved issues and furnish it to the applicant for incorporation into the environmental assessment (EA) or draft EIS.

(f) In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in each EIS or finding of no significant impact (FONSI) shall:

(1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and

(3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

(g) For major transportation actions, the tiering of EISs as discussed in the CEQ regulation (40 CFR 1502.20) may be appropriate. The first tier EIS would focus on broad issues such as general location, mode choice, and areawide air quality and land use implications of the major alternatives. The second tier would address site-specific details on project impacts, costs, and mitigation measures.

(h) For the Federal-aid highway program:

(1) Each State must have procedures approved by the FHWA to carry out a public involvement/public hearing program pursuant to 23 U.S.C. 128 and 139 and CEQ regulation.

(2) State public involvement/public hearing procedures must provide for:

(i) Coordination of public involvement activities and public hearings with the entire NEPA process.

(ii) Early and continuing opportunities during project development for the public to be involved in the identification of social, economic, and environmental impacts, as well as impacts associated with relocation of individuals, groups, or institutions.

(iii) One or more public hearings or the opportunity for hearing(s) to be held by the State highway agency at a convenient time and place for any Federal-aid project which requires significant amounts of right-of-way, substantially changes the layout or functions of connecting roadways or of the facility being improved, has a substantial adverse impact on abutting property, otherwise has a significant social,

economic, environmental or other effect, or for which the FHWA determines that a public hearing is in the public interest.

(iv) Reasonable notice to the public of either a public hearing or the opportunity for a public hearing. Such notice will indicate the availability of explanatory information. The notice shall also provide information required to comply with public involvement requirements of other laws, Executive Orders, and regulations.

(v) Explanation at the public hearing of the following information, as appropriate:

(A) The project's purpose, need, and consistency with the goals and objectives of any local urban planning,

(B) The project's alternatives, and major design features,

(C) The social, economic, environmental, and other impacts of the project,

(D) The relocation assistance program and the right-of-way acquisition process.

(E) The State highway agency's procedures for receiving both oral and written statements from the public.

(vi) Submission to the FHWA of a transcript of each public hearing and a certification that a required hearing or hearing opportunity was offered. The transcript will be accompanied by copies of all written statements from the public, both submitted at the public hearing or during an announced period after the public hearing.

(vii) An opportunity for public involvement in defining the purpose and need and the range of alternatives, for any action subject to the project development procedures in 23 U.S.C. 139.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(viii) Public notice and an opportunity for public review and comment on a Section 4(f) de minimis impact finding, in accordance with 49 U.S.C. 303(d). [FN5]

> [5] The FHWA and FTA have developed guidance on Section 4(f) de minimis impact findings titled "Guidance for Determining De Minimis Impacts to Section 4(f) Resources," December 13, 2005, which is available at http://www.fhwa.dot.gov or in hard copy upon request.

(3) Based on the reevaluation of project environmental documents required by § 771.129, the FHWA and the State highway agency will determine whether changes in the project or new information warrant additional public involvement.

(4) Approvals or acceptances of public involvement/public hearing procedures prior to the publication date of this regulation remain valid.

(i) Applicants for capital assistance in the FTA program achieve public participation on proposed projects by holding public hearings and seeking input from the public through the scoping process for environmental review documents. For projects requiring EISs, an early opportunity for public involvement in defining the purpose and need for action and the range of alternatives must be provided, and a public hearing will be held during the circulation period of the draft EIS. For other projects that substantially affect the community or its public transportation service, an adequate opportunity for public review and comment must be provided, pursuant to 49 U.S.C. 5323(b).

(j) Information on the FTA environmental process may be obtained from: Director, Office of Human and Natural Environment, Federal Transit Administration, Washington, DC 20590. Information on the FHWA environmental process may be obtained from: Director, Office of Project Development and Environmental Review, Federal Highway Administration, Washington, DC 20590.

[70 FR 24469, May 9, 2005; 74 FR 12528, March 24, 2009]

SOURCE: 52 FR 32660, Aug. 28, 1987; 62 FR 6873, Feb. 14, 1997; 74 FR 12527, March 24, 2009, unless otherwise noted.

AUTHORITY: 42 U.S.C. 4321 et seq.; 23 U.S.C. 106, 109, 128, 138, 139, 315, 325, 326, and 327; 49 U.S.C. 303, 5301(e), 5323(b), and 5324; Pub.L. 109–59, 119 Stat. 1144, sections 6002 and 6010; 40 CFR parts 1500–1508; 49 CFR 1.48(b) and 1.51.

23 C. F. R. § 771.111, 23 CFR § 771.111

Current through January 8, 2010; 75 FR 1262

© 2010 Thomson Reuters
END OF DOCUMENT

TAB F

Westlaw.

23 C.F.R. § 771.129                                                                                    Page 1

C

**Effective: April 23, 2009**

Code of Federal Regulations <u>Currentness</u>
  Title 23. Highways
     Chapter I. Federal Highway Administration,
     Department of Transportation
        ☞■ <u>Subchapter H</u>. Right–Of–Way and Environment
          ☞■ <u>Part 771</u>. Environmental Impact and Related
          Procedures <u>(Refs & Annos)</u>

          ➔ **§ 771.129 Re-evaluations.**

(a) A written evaluation of the draft EIS shall be prepared
by the applicant in cooperation with the Administration if
an acceptable final EIS is not submitted to the
Administration within three years from the date of the
draft EIS circulation. The purpose of this evaluation is to
determine whether or not a supplement to the draft EIS or
a new draft EIS is needed.

(b) A written evaluation of the final EIS will be required
before further approvals may be granted if major steps to
advance the action (e.g., authority to undertake final
design, authority to acquire a significant portion of the
right-of-way, or approval of the plans, specifications and
estimates) have not occurred within three years after the
approval of the final EIS, final EIS supplement, or the last
major Administration approval or grant.

(c) After approval of the ROD, FONSI, or CE designation,
the applicant shall consult with the Administration prior to
requesting any major approvals or grants to establish
whether or not the approved environmental document or
CE designation remains valid for the requested
Administration action. These consultations will be
documented when determined necessary by the
Administration.

[<u>53 FR 11066</u>, April 5, 1988; <u>74 FR 12530</u>, March 24,
2009]

SOURCE: <u>52 FR 32660</u>, Aug. 28, 1987; 62 FR 6873, Feb.
14, 1997; <u>74 FR 12527</u>, March 24, 2009, unless otherwise
noted.

AUTHORITY: <u>42 U.S.C. 4321 et seq.</u>; <u>23 U.S.C. 106,
109, 128, 138, 139, 315, 325, 326</u>, and <u>327</u>; <u>49 U.S.C.
303, 5301(e), 5323(b)</u>, and <u>5324</u>; <u>Pub.L. 109–59, 119
Stat. 1144</u>, sections 6002 and 6010; 40 CFR parts
1500–1508; <u>49 CFR 1.48(b)</u> and <u>1.51</u>.

23 C. F. R. § 771.129, 23 CFR § 771.129

Current through January 8, 2010; 75 FR 1262

© 2010 Thomson Reuters
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB G

Westlaw.

☞

**Effective: May 2, 2005**

Code of Federal Regulations Currentness
  Title 23. Highways
    Chapter I. Federal Highway Administration, Department of Transportation
      Subchapter H. Right–Of–Way and Environment
        Part 772. Procedures for Abatement of Highway Traffic Noise and Construction Noise (Refs & Annos)

→ **§ 772.13 Federal participation.**

(a) Federal funds may be used for noise abatement measures where:

(1) A traffic noise impact has been identified,

(2) The noise abatement measures will reduce the traffic noise impact, and

(3) The overall noise abatement benefits are determined to outweigh the overall adverse social, economic, and environmental effects and the costs of the noise abatement measures.

(b) For Type II projects, noise abatement measures will only be approved for projects that were approved before November 28, 1995, or are proposed along lands where land development or substantial construction predated the existence of any highway. The granting of a building permit, filing of a plat plan, or a similar action must have occurred prior to right-of-way acquisition or construction approval for the original highway. Noise abatement measures will not be approved at locations where such measures were previously determined not to be reasonable and feasible for a Type I project.

(c) The noise abatement measures listed below may be incorporated in Type I and Type II projects to reduce traffic noise impacts. The costs of such measures may be included in Federal-aid participating project costs with the Federal share being the same as that for the system on which the project is located.

(1) Traffic management measures (e.g., traffic control devices and signing for prohibition of certain vehicle types, time-use restrictions for certain vehicle types, modified speed limits, and exclusive lane designations).

(2) Alteration of horizontal and vertical alignments.

(3) Acquisition of property rights (either in fee or lesser interest) for construction of noise barriers.

(4) Construction of noise barriers (including landscaping for aesthetic purposes) whether within or outside the highway right-of-way.

(5) Acquisition of real property or interests therein (predominantly unimproved property) to serve as a buffer zone to preempt development which would be adversely impacted by traffic noise. This measure may be included in Type I projects only.

(6) Noise insulation of public use or nonprofit institutional structures.

(d) There may be situations where severe traffic noise impacts exist or are expected, and the abatement measures listed above are physically infeasible or economically unreasonable. In these instances, noise abatement measures other than those listed in paragraph (c) of this section may be proposed for Types I and II projects by the highway agency and approved by the FHWA on a case-by-case basis when the conditions of paragraph (a) of this section have been met.

[61 FR 45321, Aug. 29, 1996; 62 FR 42904, Aug. 11, 1997; 70 FR 16710, April 1, 2005]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

23 C.F.R. § 772.13                                                    Page 2

SOURCE: 41 FR 16936, April 23, 1976; 47 FR 29654, July 8, 1982; 47 FR 33956, Aug. 5, 1982; 61 FR 45321, Aug. 29, 1996; 62 FR 42904, Aug. 11, 1997, unless otherwise noted.

AUTHORITY: 23 U.S.C. 109(h), 109(i); 42 U.S.C. 4331, 4332; sec. 339(b), Pub.L. 104–59, 109 Stat. 568, 605; 49 CFR 1.48(b).

23 C. F. R. § 772.13, 23 CFR § 772.13

Current through January 8, 2010; 75 FR 1262

© 2010 Thomson Reuters
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB H

Westlaw.

40 C.F.R. § 1502.14                                                                              Page 1

**c**

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
   Title 40. Protection of Environment
      Chapter V. Council on Environmental Quality
         Part 1502. Environmental Impact Statement
(Refs & Annos)

      → § 1502.14 Alternatives including the
proposed action.

This section is the heart of the environmental impact
statement. Based on the information and analysis
presented in the sections on the Affected Environment (§
1502.15) and the Environmental Consequences (§
1502.16), it should present the environmental impacts of
the proposal and the alternatives in comparative form, thus
sharply defining the issues and providing a clear basis for
choice among options by the decisionmaker and the
public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all
reasonable alternatives, and for alternatives which were
eliminated from detailed study, briefly discuss the reasons
for their having been eliminated.

(b) Devote substantial treatment to each alternative
considered in detail including the proposed action so that
reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the
jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or
alternatives, if one or more exists, in the draft statement
and identify such alternative in the final statement unless
another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already
included in the proposed action or alternatives.

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise
noted.

AUTHORITY: NEPA, the Environmental Quality
Improvement Act of 1970, as amended (42 U.S.C. 4371 et
seq.), Sec. 309 of the Clean Air Act, as amended (42
U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970,
as amended by Executive Order 11991, May 24, 1977).

40 C. F. R. § 1502.14, 40 CFR § 1502.14

Current through January 8, 2010; 75 FR 1262

© 2010 Thomson Reuters
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

TAB I

Westlaw.

**c**

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
   Title 40. Protection of Environment
      ᵏ▣ Chapter V. Council on Environmental Quality
      ᵏ▣ Part 1502. Environmental Impact Statement
      (Refs & Annos)

    → § 1502.22 Incomplete or unavailable
information.

When an agency is evaluating reasonably foreseeable
significant adverse effects on the human environment in an
environmental impact statement and there is incomplete or
unavailable information, the agency shall always make
clear that such information is lacking.

(a) If the incomplete information relevant to reasonably
foreseeable significant adverse impacts is essential to a
reasoned choice among alternatives and the overall costs
of obtaining it are not exorbitant, the agency shall include
the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable
significant adverse impacts cannot be obtained because the
overall costs of obtaining it are exorbitant or the means to
obtain it are not known, the agency shall include within
the environmental impact statement:

    (1) A statement that such information is incomplete or
    unavailable; (2) a statement of the relevance of the
    incomplete or unavailable information to evaluating
    reasonably foreseeable significant adverse impacts on
    the human environment; (3) a summary of existing
    credible scientific evidence which is relevant to
    evaluating the reasonably foreseeable significant
    adverse impacts on the human environment, and (4)
    the agency's evaluation of such impacts based upon
    theoretical approaches or research methods generally
    accepted in the scientific community. For the
    purposes of this section, "reasonably foreseeable"
    includes impacts which have catastrophic

consequences, even if their probability of occurrence
is low, provided that the analysis of the impacts is
supported by credible scientific evidence, is not based
on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all
environmental impact statements for which a Notice of
Intent (40 CFR 1508.22) is published in the Federal
Register on or after May 27, 1986. For environmental
impact statements in progress, agencies may choose to
comply with the requirements of either the original or
amended regulation.

[51 FR 15625, April 25, 1986]

SOURCE: 43 FR 55994, Nov. 29, 1978, unless otherwise
noted.

AUTHORITY: NEPA, the Environmental Quality
Improvement Act of 1970, as amended (42 U.S.C. 4371 et
seq.), Sec. 309 of the Clean Air Act, as amended (42
U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970,
as amended by Executive Order 11991, May 24, 1977).

40 C. F. R. § 1502.22, 40 CFR § 1502.22

Current through January 8, 2010; 75 FR 1262

© 2010 Thomson Reuters
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

TAB J

Westlaw.

40 C.F.R. § 1508.8                                                                               Page 1

**c**

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
   Title 40. Protection of Environment
      Chapter V. Council on Environmental Quality
         Part 1508. Terminology and Index (Refs &
         Annos)

    → **§ 1508.8 Effects.**

Effects include:

(a) Direct effects, which are caused by the action and
occur at the same time and place.

(b) Indirect effects, which are caused by the action and are
later in time or farther removed in distance, but are still
reasonably foreseeable. Indirect effects may include
growth inducing effects and other effects related to
induced changes in the pattern of land use, population
density or growth rate, and related effects on air and water
and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are
synonymous. Effects includes ecological (such as the
effects on natural resources and on the components,
structures, and functioning of affected ecosystems),
aesthetic, historic, cultural, economic, social, or health,
whether direct, indirect, or cumulative. Effects may also
include those resulting from actions which may have both
beneficial and detrimental effects, even if on balance the
agency believes that the effect will be beneficial.

SOURCE: 43 FR 56003, Nov. 29, 1978, unless otherwise
noted.

AUTHORITY: NEPA, the Environmental Quality
Improvement Act of 1970, as amended (42 U.S.C. 4371 et
seq.), sec. 309 of the Clean Air Act, as amended (42
U.S.C. 7609), and Executive Order 11514 (Mar. 5, 1970,

as amended by Executive Order 11991, May 24, 1977).

40 C. F. R. § 1508.8, 40 CFR § 1508.8

Current through January 8, 2010; 75 FR 1262

© 2010 Thomson Reuters
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.