## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **SIERRA CLUB** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:09-cv-00692** |
| | § | |
| **UNITED STATES FEDERAL HIGHWAY** | § | |
| **ADMINISTRATION; ET AL.,** | § | |
| | § | |
| *Defendants.* | § | |

## FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT

Respectfully submitted,

TIM JOHNSON
United States Attorney

Jack F. Gilbert
Special Assistant United States Attorney
Texas Bar No. 00786946
60 Forsyth St., SW  suite 8M5
Atlanta, GA 30303
Ph. (404) 562-3924
Fax: (404) 562-3702

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.  STATUTORY FRAMEWORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.  STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   A.  Administrative Procedure Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   B.  Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.  SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VI.  ARGUMENT and AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . 14
   A.  FHWA Complied with NEPA

      1.  FHWA Considered a Reasonable Range of Alternatives . . . . . . . . . . . . . . . . 14

      2.  FHWA Complied with NEPA in Looking at Potential Impacts
         on Hydrology, Drainage, Floodways and Flood Plains  . . . . . . . . . . . . . . . . . . . 18

      3.  Potential Impacts and Effects on Wetlands were Fully Evaluated . . . . . . . . 22

      4.  The Project's Air Quality Impacts were Fully Evaluated . . . . . . . . . . . . . . . 24

      5.  Noise Impacts Studies and Findings are in Compliance with NEPA. . . . . . . 27

      6.  Indirect and Cumulative Impacts were Fully Analyzed and Considered. . . . 29

VIII.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . 32

# TABLE OF AUTHORITIES

Case                                                                    Page

Atlanta Coalition on the Transp. Crisis, Inc. v. Atlanta Regional Comm'n.,
599 F.2d 1333 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

Baltimore Gas and Electric Co. v. Natural Resources Defense Council,
462 U.S. 87 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,
 419 U.S. 281 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . .  10

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . 13

Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190 (D.C. Cir. 1991). . . . . . . . . . .9, 15, 17

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971) . .. . . . . . . . . . . . . . . . 11

City of Alexandria v. Slater, 198 F.3d 862 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . .15

City of Grapevine, Tex. v. Dep't of Transp., 17 F.3d 1502 (D.C. Cir. 1994) . . . . . . . . . . . . .. . .17

City of Olmsted Falls, Ohio v. FAA, 292 F.3d 261 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . .11

Dep't of Transp. v. Public Citizen, 541 U.S. 752 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Druid Hills Civic Ass'n v. FHWA, 772 F.2d 700 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . . 12

Earth Island Inst. v. Forest Service, 351 F.3d 1291 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . 21

Fund for Animals v. Babbitt, 903 F.Supp. 96 (D.D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 13

Kleppe v. Sierra Club, 427 U.S. 390 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . .. .10, 11

Laguna Greenbelt, Inc. v. Dep't of Transp., 42 F.3d 517 (9th Cir. 1994). . . . . . . . . . . . . . . . 12

Louisiana Ass'n of Independent Producers v. FERC, 958 F.2d 1101
(D.C. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . 11

Lujan v. National Wildlife Fed'n, 497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Lun Kwai Tsui v. Attorney General, 445 F. Supp. 832, 835 (D.D.C. 1978) . . . . . . . . . . . . . .13

iii

Marsh v. Oregon Natural Res. Council, 490 U.S. 360 (1989) . .. . . . . . . . . . . . . . . . . . . passim

Mississippi River Basin Alliance v. Westphal, 230 F.3d 170
(5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

Mo. Coalition for the Env't v. Corps of Eng'rs of the U.S. Army,
866 F.2d 1025 (8th Cir.1989) . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29
(1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . 13

Natural Res. Def. Council, Inc. v. Hodel, 865 F.2d 288 (D.C. Cir. 1988) . . . . . . . . . .  10, 12, 17

North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1541 (11th Cir.1990) . . . . . . . . . . .. .21

Nevada v. Dep't of Energy, 457 F.3d 78, 87-88 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . .17

Olabisiomotosho v. City of Houston, 185 F.3d 521 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . 26

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989) . . . . . . . . . . . . . . . 9, 10, 25

Rusty Roberts v. Cardinal Servs., 266 F.3d 368 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 13

Stop H-3 Ass'n v. Dole, 740 F.2d 1442 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

Sierra Club v. Federal Emergency Management Agency,
Civil Action H-07-0608 (SD Tex.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . 21

Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223
(1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . .9, 10, 14

Tongass Conservation Soc'y v. Cheney, 924 F.2d 1137 (D.C. Cir. 1991). . . . . . . . . . . . . . . .17

Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519 (1978) . . . . . . . . . . . . . . . . 10

Young v. General Services Admin., 99 F. Supp. 2d 59 (D.D.C.),
aff'd, 11 Fed. Appx. 3 (D.C. Cir. 2000. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Constitutional Provisions, Statutes, and Rules**

23 C.F.R. § 771 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . 29

23 C.F.R. § 771.115 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . 3

23 C.F.R. § 771.129 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

23 C.F.R. § 772 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . 27

40 C.F.R. § 1500, *et seq.* . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . 2, 10

40 C.F.R. § 1502.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14, 15

40 C.F.R. § 1502.24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . 21

40 C.F.R. § 1508.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ... . . . . . . . 3

FED. R. CIV. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13

5 U.S.C. §§ 701, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . .2, 11

23 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . 3

23 U.S.C. § 109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

23 U.S.C. § 134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . 18

42 U.S.C. § 4332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . 2, 14

42 U.S.C. §§ 7407-7409 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . 25, 26

42 U.S.C. §§ 7410-77671 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 26

**Legal Treatises**

Charles Alan Wright *et al., Federal Practice and Procedure* (ed. 1998). . . . . . . . . . . . . . . . . . 13

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **SIERRA CLUB** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:09-cv-00692** |
| | § | |
| **UNITED STATES FEDERAL HIGHWAY** | § | |
| **ADMINISTRATION; ET AL.,** | § | |
| | § | |
| *Defendants.* | § | |

## FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT

COMES NOW the United States Federal Highway Administration ("FHWA"), Janice W. Brown in her official capacity as Division Administrator of FHWA, Texas Division; Jeffrey F. Paniati, P.E., named in his official capacity as the Administrator of FHWA[1]; the United States Department of Transportation; and Ray LaHood, in his official capacity as Secretary of Transportation (collectively, "Federal Defendants"); in the above-styled and captioned cause, by and through the undersigned counsel and file this Motion for Summary Judgment and Brief in Support.

The Federal Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) and in support of this motion provide the following brief in support.

---

[1] The current Administrator of FHWA is Victor Mendez. Mr. Mendez assumed the Administrator's position on July 17, 2009.

- 1 -

# I.  INTRODUCTION

On March 9, 2009, Plaintiff filed its Original Complaint challenging the Federal Highway Administration's, ("FHWA") approval of Segment E of the Grand Parkway, State Highway 99. (Dkt. no. 1).[2] Plaintiff alleges Defendants committed violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, *et seq*.; NEPA's implementing regulations, 40 C.F.R. § 1500-1508; Executive Order 11988; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701-706.

Plaintiff's lawsuit asserts that the there are deficiencies in the Final Environmental Impact Statement ("FEIS") issued by FHWA in November 2007. Besides the FEIS the other major or key documents issued by FHWA include the project's Notice of Intent (NOI) to prepare an environmental impact statement in August 1993, the Draft Environmental Impact Statement (DEIS) issued in February 2003, the FHWA Record of Decision ("ROD") issued on June 24, 2008, the Re-evaluation of the FEIS in June 2009, and FHWA's Revised ROD issued on June 9, 2009.

In Plaintiff's complaint they specify general six causes of actions and assert that the Federal Defendants  1) conducted an inadequate and unlawful alternatives analysis; 2) failed to properly assess impacts on hydrology, drainage, floodways and flood plains; 3) failed to disclose significant impacts and indirect effects on wetlands; 4)  failed to disclose significant air impacts

---

[2] On October 15, 2009, Plaintiff Sierra Club sought permission to amend its complaint to add various new claims, add an additional plaintiff and a new defendant. (Dkt. no. 27). The court's order of  November 25, 2009, only permitted the Plaintiff Sierra Club to amend to add Houston Audubon as a party plaintiff in this case. (Dkt no. 43). However, Plaintiff has yet to file any amended complaint. Thus, the Federal Defendants will refer to the Plaintiff solely as the Sierra Club. If the motion to amend and the court's order are considered as having effectuated the filing of the proposed amended complaint, then this Motion for Summary Judgment is also meant and should be read to include both parties as the Plaintiffs.

and safety risks; 5) failed to disclose noise impacts; and, finally, 6) failed to consider indirect secondary and cumulative impacts.

FHWA is an agency within the United States Department of Transportation that administers the federal-aid highway program to States for highway construction, rehabilitation and other transportation projects. *See* 23 U.S.C. § 101, *et seq*. As such, the FHWA is the agency responsible for approving state transportation projects for federal funding, and ensuring compliance with myriad federal statutes and regulations, including but not limited to NEPA. Final approvals under NEPA are issued by FHWA in a Record of Decision on Environmental Impact Statements. Such environmental statements are required where the project meets certain regulatory standards. *See* 23 C.F.R.§ 771.115; *see also* 40 C.F.R. § 1508.27.

## II. STATEMENT OF ISSUES

1.     The Federal Defendants fully complied with the requirements of NEPA in its approval of the Grand Parkway project, Segment E. This includes its consideration of alternatives in that all reasonable alternatives were considered. Additionally, the Federal Defendants assessment of environmental impacts on hydrology, drainage, floodways, flood plains, and wetlands. The Federal Defendants also disclosed all air and noise impacts in full compliance with NEPA. Finally, the Federal Defendants also met all NEPA requirements as to its consideration and evaluation of indirect and cumulative impacts.

2.     The Federal Defendants did not act arbitrarily in its decision to issue a Record of Decision or Revised Record of Decision based on the Final Environmental Impact Statement and

the Re-evaluation prepared for the project. The actions of the Federal Defendants comply with NEPA and the APA and is fully supported by the Administrative Record.

## III.  BACKGROUND

The Grand Parkway project was initially proposed in 1961 by Harris County and the City of Houston Planning Commission. It was envisioned as a 180-mile outer highway looping around the Houston metropolitan area. It was intended to address transportation deficiencies in the area.  *See* Doc. No. 624, AR 017909.[3]  The entire proposed facility would traverse Harris, Montgomery, Liberty, Chambers, Galveston, Brazoria, and Fort Bend Counties, Texas and provide access to radial highways such as I-10, I-45, US 290, US 59, SH 249, etc.

In August 1993, TxDOT and FHWA filed a Notice of Intent ("NOI") to prepare an Environmental Impact Statement ("EIS") for Segment E was published in the Federal Register. *See* Doc No. 42, AR 001026-001027. Subsequently, and throughout the entire Grand Parkway planning process, Defendants conducted extensive agency and public coordination that included public workshops, public scoping meetings, and coordination with resource agencies such as the Environmental Protection Agency ("EPA"), Texas Parks and Wildlife Department ("TPWD"), United States Fish and Wildlife Service ("USFWS"), and the United States Army Corps of

---

[3] The Administrative Record consists of approximately 26,000 pages and will be referred to as "AR" or Record.  The original Record was filed on September 15, 2009, and contained 715 documents, numbered AR 000001 through AR 025036.  The Record was supplemented on October 15, 2009, adding 16 new documents, numbered AR 025037 through AR 026458. It is anticipated that one new minor supplementation will occur adding documents requested by Plaintiff. In addition to the AR numbers the motion will also reference the document number from the AR index.

Engineers ("USACE").[4]  *See, e.g.,* AR 018130.

After some delay and a good deal of work and study, in February 2003, a DEIS was issued with a recommended alternative. *See* Doc No. 411. This selection was made after a great deal of public and resource agency input, and analysis and comparison of the potential effects on the physical, biological, and human environments of each alternative alignment. *Id.*  Throughout the entire Grand Parkway planning process, Defendants conducted extensive agency and public coordination that included public workshops, public scoping meetings, and coordination with resource agencies.[5] These meetings included coordination with agencies such as the Environmental Protection Agency ("EPA"), Texas Parks and Wildlife Department ("TPWD"), United States Fish and Wildlife Service ("USFWS"), and the United States Army Corps of Engineers ("USACE").  *See, e.g.,* AR 018130.

Segment E, as proposed, would be a four-lane controlled access toll road with intermittent frontage roads from Franz Road (near I-10) to US 290 (Northwest Freeway) through Harris County. For Segment E, the alternative alignments were developed within the project area to fulfill the need and purpose of the project, to minimize potential environmental impacts, and to respond to public/landowner and resource agency comments. Segment E of the Grand Parkway would be located in the northwest Houston/Katy area, running from IH 10 W to US

---

[4] Formal public scoping meetings were held in September 1993 and February 2000 for several segments of the project, including Segment E, to assist in determining the scope of issues related to selecting a Preferred Alternative Corridor for the Grand Parkway. *See* AR 018641–018647.

[5] Formal public scoping meetings were held in September 1993 and February 2000 for several segments of the project, including Segment E, to assist in determining the scope of issues related to selecting a Preferred Alternative Corridor for the Grand Parkway.  AR 018641–018647.

290, and will be approximately 14 miles long.  It is included in and is consistent with the 1995

National Highway System designation, Texas' Statewide Transportation Improvement Program

("STIP"), and, at the local level, Harris County's Major Thoroughfare and Free Plan ("MTFP"),

2025 long-range Regional Transportation Plan ("RTP"), and is a part of the locally approved

Transportation Improvement Program ("TIP").   *See* AR 018303-AR 018304.   Its proposed

design is a four-lane controlled access toll road with intermittent frontage roads located within a

400-foot right-of-way. *Id*.

During the project development process, a Study Team was formed.[6]  Team members

performed several studies to determine the need for and purpose of the project, analyze various

alternatives, determine the affected environment, and study indirect and cumulative effects.  AR

018304.   The Study Team was responsible for organizing information obtained from the

environmental studies, as well as from the public workshops, and clearly presenting the

information in the graphs and tables that appear throughout the FEIS.  AR 018305; *see, e.g.,* AR

018385 (ambient noise level table for Segment E project area); AR 018391 (Segment E Project

Area vegetative communities summary); AR 018584 (conceptual model showing interplay of

land use, resources, cumulative impacts and potential effects).

To facilitate the process of determining and planning the "Preferred Alternative Corridor

and Alternative Alignment", the Study Team established a 300 square-mile study area.  AR

018308.  A Geographic Information System ("GIS") was used to efficiently collect, organize,

---

[6] In addition to representatives from FHWA, TxDOT and the Grand Parkway Association, members of the Study Team include consultant representatives: Michael Baker Jr., Inc., a professional engineering and consulting service; PBS&J, which provides expertise in engineering, environmental science, architecture, planning, and construction; Brown and Gay Engineers, Inc., which provides civil engineering and surveying services for drainage, traffic, and transportation projects (among others); and Community Awareness Services, Inc.  *See* AR 017900.

analyze, and display large amounts of environmental data gathered in the study area, and to assist in analyzing the expressed concerns of several environmental resource agencies. *Id*. This information was then used to create environmental resource maps, so that sensitive resources could be identified, avoided, and minimally impacted when developing alternative corridors. *Id*.

In April 2003 the Texas Transportation Commission stated in Minute Order 109226 that, "the completion of the Grand Parkway is essential and urgent, as construction of the project would alleviate congestion and improve traffic flow in the Houston metropolitan area and the surrounding region..." AR 017910. Four years later, following much additional agency coordination and receipt of public input, Segment E FEIS was issued in November 2007. Based upon the DEIS, FEIS and the Record, FHWA then issued its ROD for Segment E on June 24, 2008. *See* Doc. No. 668, AR 023192-023258. On September 10 2008, FHWA published in the Federal Register a statute of limitations requiring any legal claims against the ROD to be asserted within 180 days. *See* Doc. No. 679, AR 023400-023402; *see also* 23 U.S.C. § 139(l).

Within the 180 day period, on March 9, 2009, Plaintiff, Sierra Club, filed this lawsuit pursuant to the APA and NEPA. Plaintiff, in it six causes of action, seeks declaratory and injunctive relief, including an order that Defendants conduct a Supplemental Environmental Impact Statement ("SEIS") to cure alleged violations of NEPA, its implementing regulations, and the APA.[7]

---

[7] The term "Defendants" refers to the various federal and state defendants who played key roles in the preparation of the approved FEIS which is the subject of this suit. The responsibilities of FHWA and state highway agencies, for compliance with NEPA, are generally outlined in 23 C.F.R. Part 771. These regulations contain FHWA's procedures for implementing NEPA and the Council on Environmental Quality ("CEQ") regulations. Under both FHWA and CEQ regulations, state highway agencies generally prepare the environmental impact statement and other environmental documents for a highway project using federal funds with the FHWA furnishing guidance, participating in the preparation, and independently evaluating and approving the documents. 23 C.F.R. §

- 7 -

Plaintiff sued the listed Federal Defendants as well as state entities including Texas Transportation Commission ("Commission") and Deirdre Delisi, in her capacity as Chair of the Texas Transportation Commission. The Commission oversees and directs the operations of the Texas Department of Transportation ("TxDOT"), the state transportation agency responsible for administering the highway system in Texas.

Following the lawsuit's filing, in June 2009, a Re-evaluation of the FEIS in response to a design revision for one portion of Segment E that occurred after the issuance of the ROD. *See* Doc. No. 702, AR 023722. A Re-evaluation is required in these circumstances to be prepared under FHWA's NEPA regulations. 23 C.F.R. § 771.129. The design revision, which required no additional right-of-way or easements, involved an additional grade separation to be constructed at the future intersection of the Grand Parkway and West Road. AR 023726.

In response to this design change, the Re-evaluation considered how the revision may affect the environmental impact analysis in the FEIS and whether a new and comprehensive analysis of the entire project was needed. AR 023722. The original schematic design of the Grand Parkway project called for both cash and electronic toll collection facilities at this location, which prohibited the construction of a West Road overpass to traverse the Grand Parkway. AR 023726–023727. However, the design was subsequently converted to an all-electronic toll collection facility, thus removing design constraints and allowing for the construction of an overpass. *Id.* The remainder of the Segment E project remains unchanged. AR 023722.

After an evaluation of the design change's potential impacts on many of the

771.109(c)(1).

environmental and social resources covered in the FEIS, as well as consideration of any new information, an in compliance with federal regulations and guidance, the Re-evaluation reached the conclusion that no substantive change in Segment E's environmental impact would occur and thus no new study was required.  *See*, Doc. No. 702, AR 023751. A Revised ROD was signed issued in June 2009. *See* Doc. No. 706. On July 13, 2009, FHWA published in the Federal Register another statute of limitations notice requiring any additional legal claims against the Revised ROD to be asserted within 180 days. *See* Doc. No. 713; *see also* 23 U.S.C. § 139(l).

The Record in this case shows that FHWA has complied with all of the NEPA requirements and that the findings and decisions in the FEIS, ROD, Re-evaluation and Revised ROD, are not "arbitrary and capricious."

## IV. STATUTORY FRAMEWORK

A. National Environmental Policy Act

NEPA focuses the attention of federal agencies and the public on the potential environmental consequences of proposed actions so that an agency does not act without complete information regarding the environmental harm that may occur when the action is implemented. *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 371 (1989); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989). NEPA's mandate to agencies is procedural, not substantive, and does not mandate particular results. *Methow Valley,* 490 U.S. at 350; *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227-28 (1980); *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558 (1978). Courts should "enforce the statute by ensuring that agencies comply with NEPA's procedures, and not by coaxing agency decisionmakers to reach certain results." *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d

- 9 -

190, 194 (D.C. Cir. 1991). A court may not require agencies "to elevate environmental concerns over other appropriate considerations." *Strycker's Bay,* 444 U.S. at 227. "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed - rather than unwise - agency action." *Methow Valley,* 490 U.S. at 351.

NEPA is designed to ensure that agencies consider the environmental impact of their decisions on "major federal actions," and requires agencies that propose projects likely to "significantly [affect] the quality of the human environment," to take a "hard look" at the environmental effect of the projects. 42 U.S.C. § 4332(2)(C); *Kleppe v. Sierra Club,* 427 U.S. 390, 409-410 (1976). NEPA is "essentially procedural and does not mandate particular consequences."[8] *Strycker's Bay* 444 U.S. at 227. Nor does NEPA pre-ordain any environmental result. *Vermont Yankee Nuclear Power Corp.* 435 U.S. at 548. If the decision is "fully informed" and "well-considered," it is entitled to judicial deference, and a reviewing court should not substitute its own policy judgment for the agency's. *Natural Res. Def. Council, Inc. v. Hodel,* 865 F.2d 288, 294 (D.C. Cir. 1988).

The court's task is to determine whether the agency considered the relevant factors and articulated "a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Resources Defense* Council, 462 U.S. 87,105, 103 S.Ct. 2246, 76 L.Ed 2d 437 (1983); *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.* 419 U.S. 281, 285-286 (1974).

---

[8] Procedures for implementing NEPA are set forth in regulations promulgated by the Council of Environmental Quality, ("CEQ"), at 40 C.F.R. Part 1500. FHWA's NEPA regulations are set forth at 23 CFR Part 771, and additional guidance for preparing NEPA documents is contained in FHWA's Technical Advisory T-6640.8A.

# V. STANDARDS OF REVIEW

A. <u>Administrative Procedure Act</u>

The substantive statute before the court, NEPA, does not grant an independent right of action. Rather, Plaintiffs' challenges to FHWA's actions are, necessarily, brought pursuant to the Administrative Procedure Act ("APA"). *See City of Olmsted Falls, Ohio v. FAA,* 292 F.3d 261, 269 (D.C. Cir. 2002) (reviewing NEPA claims under the APA standard). In evaluating the legal sufficiency of the agency's action, the Court must apply the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A), (C). *See Marsh,* 490 U.S. at 360; *Louisiana Ass'n of Independent Producers v. FERC,* 958 F.2d 1101, 1117 (D.C. Cir. 1992).

The court's review of this case is, therefore, under the APA. The standard of review "is a narrow one" and focuses on whether the agency actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416 (1971); *Marsh* at 378. The Court must ask "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* In the context of NEPA, this review prohibits a court from "substitut[ing] its judgment for that of the agency as to the environmental consequences of its actions." *Kleppe* at 410 n.21. A court is only to assess whether the agency's decision is "within the bounds of reasoned decision making." *Baltimore Gas & Electric Co.* 462 U.S. at 105; *see also Vermont Yankee Nuclear Power Corp.* 435 U.S. at 555. As the Fourth Circuit has explained:

> In reviewing [agency] action, we bear in mind that the Act, like other environmental statutes, requires balancing conflicting priorities-in this case, water conservation, private compliance costs, state regulatory interests, and the safety of public water systems. Accordingly, we do not "sit as a scientific body, meticulously reviewing all data under a laboratory microscope." *Natural Res. Def.*

- 11 -

> *Council,* 16 F.3d at 1401. Nor is it "for the judicial branch to undertake comparative evaluations of conflicting scientific evidence." *Natural Res. Def. Council v. EPA,* 824 F.2d 1211, 1216 (D.C.Cir.1987). Rather, [the agency] must "explain its course of inquiry, its analysis, and its reasoning," and show a rational connection between its decision-making process and its ultimate decision.

*Natural Res. Def. Council,* 16 F.3d at 1401

In considering NEPA claims, courts apply a "rule of reason" to determine whether the agency's analysis contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Laguna Greenbelt, Inc. v. Dep't of Transp.,* 42 F.3d 517, 523 (9th Cir. 1994); *see also Dep't of Transp. v. Public Citizen,* 541 U.S. 752, 767 (2004). A court's review is limited to the administrative record before the agency at the time of its decision. *Vermont Yankee,* 435 U.S. at 549.

Deference to an agency's decision is particularly warranted with respect to technical or scientific questions involving substantial agency expertise. *Marsh,* 490 U.S. at 377. A federal court does not sit "as a 'super professional transportation analyst' or decide which party utilized the better methodology in conducting its ... analysis. Rather, the district court simply determine[s] whether the appellees' [FHWA] choice of methodology had a rational basis, consistently applied, taking relevant considerations into account." *Druid Hills Civic Ass'n v. FHWA,* 772 F.2d 700, 709 (11th Cir. 1985); *see also, Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1464-65 (9th Cir. 1982)("[O]ur rule is not that of a 'super-planner,' and, under NEPA, we are not allowed to substitute our judgment for that of the agency concerning the wisdom of a proposed action.") (internal citation omitted).

B. <u>Summary Judgment</u>

Generally, summary judgment is appropriate if there is no genuine issue regarding any

material fact and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Because claims brought under the APA are appropriately decided without trial or discovery, on the basis of an existing administrative record, such claims are properly decided on summary judgment. *See,* 10B Charles Alan Wright *et al., Federal Practice and Procedure* § 2733 (ed. 1998); *Young v. General Services Admin.,* 99 F. Supp. 2d 59, 65 (D.D.C.), *aff'd,* 11 Fed. Appx. 3 (D.C. Cir. 2000). Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision although the court does not employ the exact standard of review set forth in Rule 56. *Fund for Animals v. Babbitt* 903 F.Supp. 96 (D.D.C. 1995).

In considering the instant motion for summary judgment, the Court must limit its review to those facts contained in the Administrative Record. *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). The "merit of the administrative decision is to be determined exclusively on the administrative record ... [and] summary judgment is appropriate after a review of the administrative record." *Lun Kwai Tsui v. Attorney General,* 445 F. Supp. 832, 835 (D.D.C. 1978).

As with any summary judgment, the facts and the inferences to be drawn from the record are to be viewed in the light most favorable to the nonmoving party. *Rusty Roberts v. Cardinal Servs.,* 266 F.3d 368, 373 (5th Cir. 2001) (*citing Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999)). However, as there are no material facts essential to the Court's resolution of the litigation, and the Court need not, indeed, may not, "find" underlying facts. Rather, the only issues presented are issues of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 883 (1990). Thus, the role of a reviewing

court is quite limited. Finally, the burden of proving that an agency decision was "arbitrary or capricious" generally rests with the party seeking to overturn the agency decision.

## VI.  SUMMARY OF ARGUMENT

The Federal Defendants assert that they have fully complied with NEPA as is evidenced by the Record. Nothing in the Record supports Plaintiff's claim that the Federal Defendants acted arbitrarily or capriciously or outside the law in approving the issuance of a ROD for the subject project. The Federal Defendants have followed all of the laws and regulations which are applicable in this Federal action. This project has been fully evaluated and studied and the Federal actors have taken the requisite "hard look."

## VII. ARGUMENT AND AUTHORITIES

### A.  FHWA Complied with NEPA

1.  <u>FHWA Considered a Reasonable Range of Alternatives</u>

Plaintiff's complaint asserts that FHWA failed to include reasonable alternatives in the FEIS and that only one alternative was studied beyond the no-build. This assertion is not confirmed by the record.

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives" and must explain why it has eliminated an alternative from detailed study, 40 C.F.R. § 1502.14(a); the agency must consider a "no action" alternative, id. § 1502.14(d); and the agency must designate a "preferred" alternative, id. § 1502.14(e). The CEQ regulations do not define what is a "reasonable"

alternative. The guidance from CEQ's provides that in "determining the scope of alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative. Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant." [9]

In identifying reasonable alternatives, initially in the DEIS and later in the FEIS, FHWA was required under NEPA to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). The range of alternatives to be considered must be based on the "purpose and need" of the proposed project. 40 C.F.R. § 1502.14. [10] FHWA was not required to consider alternatives that would not meet the project's purpose and need. *Citizens Against Burlington,* 938 F.2d at 195. The range of alternatives to be considered is thus guided by the stated objectives for the project. *City of Alexandria v. Slater,* 198 F.3d 862, 867 (D.C. Cir. 2000).  The FEIS for Segment E identified the need and the project purpose as follows:

> Transportation improvements are needed in the Segment E study area because there are inefficient connections between suburban communities and major radial roadways, the current and future transportation demand exceeds capacity, many roadways in the study area have a high accident rate, and there is an increasing strain on transportation infrastructure from population and economic growth.
>
> Doc. no. 624, AR 017858

---

[9] CEQ, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations" (Mar. 16, 1981), Question 2a.

[10] This is also referred to in this brief as "need and purpose." Need has been recognized basically as laying out the problems or transportation issues and purpose is the method or proposal to address those issues.

The purpose of the proposed transportation improvements in the Segment E study area is to efficiently link the suburban communities and major roadways, enhance mobility and safety, and respond to economic growth. The goal is to improve system linkage, address current and future transportation demand, improve safety, and address population and economic growth.

Doc no. 624, AR 017859

The need and purpose of the project, as stated in the FEIS, was arrived at following a lengthy process. The DEIS notes in project history section that the Grand Parkway (as a whole) was first proposed in 1961 by Harris County and the City of Houston Planning Commission and that the corridor was placed on city maps in 1968. See, Doc. no. 411, AR 009087. The segment's need and purpose was specifically discussed and debated at various stages of the Grand Parkway project. For example, the project's need and purpose was discussed defined in a preliminary study document back in January of 2000. *See*, Doc. no. 172, AR 005914-005933. This study document was then provided to and reviewed by an expert panel of citizens brought together to provide input to TxDOT and FHWA. *See*, Doc. no. 181, AR 006207-006249.[11] The project's consideration of alternatives also has a long and detailed history.

The consideration of alternatives for the area also goes back to the beginnings of this project. As the record reveals more alternatives were evaluated than Plaintiff suggests. The discussion of alternatives was fully outlined first in the DEIS and later in the FEIS. Alternatives initially analyzed included Transportation System Management (TSM - which looks at ways to use the existing facilities more efficiently, e.g., with ride-sharing, park/ride lots, intersection

---

[11] The development of the project and its segments, as noted herein, can be traced back to the early 1960's.  It was also recognized and approved by Congress in the Department of Transportation and Related Agencies Appropriations Bill of 1993; HR5518, Report accompanying bill, signed by President Bush on 10/06/1992.  The section of the bill dealing with the Grand Parkway was referenced in and attached to a letter from the Sierra Club to Governor Ann Richards in October 1992.  See Doc. no. 26, AR 000748-000750.

improvements, traffic signalization, etc.); Traffic Demand Management (TDM - which seeks to effect travel demand at peak hours through influencing commuters by using such things as carpools, flex-time, telecommuting, etc.); Modal Alternatives, such as Bus Transit, High Occupancy Vehicle (HOV) lanes, and rail transit/feasibility; the alternative of building a new roadway ("Build Alternatives"), and finally the No-Build Alternative. *See*, Doc no. 411, AR 009119-009151 (vol. 1 of DEIS) and AR 009392-009401 (vol.2 of DEIS); Doc. no. 624, AR 017938-017969 (vol. 1 of FEIS) and AR 018325-018358 (vol. 2 of FEIS).

After considering a range of alternative solutions, the DEIS and FEIS evaluated those proposals in light of the project's statement of need and purpose. Those discussions in the published documents show that a number of proposed alternatives were properly dropped from consideration as they did not meet need and purpose. *See, e.g*., Doc. no. 624, AR 018340-018341. The selection of alternatives "must be bounded by some notion of feasibility." *Vermont Yankee,* 435 U.S. at 551; *see also City of Grapevine, Tex. v. Dep't of Transp.,* 17 F.3d 1502, 1506 (D.C. Cir. 1994). In addition, FHWA's selection of alternatives should be reviewed under the "rule of reason." *Citizens Against Burlington,* 938 F.2d at 196. An agency need not consider alternatives that are "remote and speculative," but should consider the circumstances of the project "as they exist and are likely to exist." *NRDC v. Hodel,* 865 F.2d 288, 295 (D.C. Cir. 1988). An agency's discussion of alternatives should be upheld "so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Citizens Against Burlington,* 938 F.2d at 196; *see also Nevada v. Dep't of Energy,* 457 F.3d 78, 87-88 (D.C. Cir. 2006); *Tongass Conservation Soc'y v. Cheney,* 924 F.2d 1137, 1140 (D.C. Cir. 1991).

In addition FHWA necessarily took into consideration the results of the transportation

planning process carried out by the local communities through the Metropolitan Planning Organization (MPO). In the Harris County area this entity operates through the Houston-Galveston Area Council (H-GAC). MPOs are federally authorized local transportation planning agencies. 23 U.S.C. § 134. Under Federal law, FHWA may only approve/fund projects or portions of projects in a metropolitan area if they are included in a metropolitan area Transportation Improvement Program (TIP). The MPO is responsible for having a continuous, cooperative and comprehensive transportation planning process that results in plans, programs and projects that consider all transportation modes and support metropolitan community and economic development and social goals. *See, e.g.*, *Atlanta Coalition on the Transp. Crisis, Inc. v. Atlanta Regional Comm'n.,* 599 F.2d 1333, 1338-40 (5th Cir. 1979). The H-GAC has designated the Grand Parkway as an approved highway transportation project in its TIP. The Grand Parkway, specifically the area comprising Segment E, has been shown in most all approved TIPs since the 1990's and is in the most current plan. *See*, Doc. no. 661, AR 21470-22070.

As the record shows, FHWA fully met its obligation to consider reasonable alternatives that meet the transportation objectives of the project as defined during the transportation planning process and as further vetted through the environmental process. Accordingly, its consideration of alternatives meets the requirements of NEPA.

2.    <u>FHWA Complied with NEPA in Looking at Potential Impacts on Hydrology, Drainage, Floodways and Flood Plains</u>

Plaintiff alleges that the Federal Defendants failed to consider and take into account impacts on hydrology, drainage, floodways and flood plains. From past comments, and given motions filed in this case, it appears Plaintiff is concerned that the Federal Defendants did not

- 18 -

use the best available data on floodplains when it issued its decision in this case. But, in fact, the Defendants did consider the latest available mapping before FHWA issued its Revised Record of Decision (ROD) in June 2009. But, water issues were considered and evaluated almost from the beginning of the project.

First, the record is replete with drainage studies. Specific evaluations on drainage in the area were completed over several years by retained engineering experts in drainage analysis. *See, e.g.*, Doc. no. 603, AR 015763-016333; Doc. no. 665, AR 022085-023153; Doc. no. 682, AR 023409-023435; and, Doc. No. 703, AR 023774-024850. The FEIS also fully reported on potential impacts and effects on water issues such as drainage and hydrology. See, FEIS Doc No. 624, AR 018404-018408 (description of flood plains, hydrology and drainage in area), AR 018513-018524 (environmental consequences including indirect effects and mitigation on water resources).

In addition to the various drainage analysis studies,  other reports including mapping and record entries show that the water issues were being evaluated throughout the NEPA process. See, e.g., Doc. No. 348; Doc. No. 422; Doc. No. 472; Doc. No. 526. In fact, two of the earliest entries in the Record were regarding data on hydrology in the area. See Doc. No.'s 5 and 6.

Second, as noted above, the Federal Defendants assume that Plaintiffs will again argue that somehow an incorrect flood plain map was relied upon during the project's NEPA process. *See,* Plaintiff's  Corrected Motion To Supplement The Administrative Record And For Leave To Conduct Limited Discovery On An Expedited Basis.(Dkt. no. 34). However, as was shown in our response filed at the time, this allegation does not withstand any serious scrutiny.

During the process of re-evaluating the project and its impacts, required due to a project design change pursuant to 23 CFR § 771.129, the Re-evaluation of the FEIS noted:

> Following the issuance of the ROD, the Harris County Flood Control District (HCFCD), which is the managing agency responsible for regulating hydrologic and hydraulic features within Harris County, performed a study of the Upper Cypress Creek watershed that resulted in a proposed Physical Map Revision (PMR). This PMR is currently under review by Federal Emergency Management Agency (FEMA) and, once approved, will require that the associated Digital Flood Insurance Rate Maps (DFIRMs) are physically revised and republished. Harris County Commissioner's Court adopted the PMR data as the best available data for use on August 19, 2008.

> *Re-evaluation of the Final Environmental Impact Statement*, June 2009, Document 702, AR023736.

The Re-evaluation document and FHWA's Revised ROD also show the analysis of flood plain impacts was analyzed and considered using the most current approved floodplain map from Harris County Flood Control District (HCFCD):

> The floodplains and floodways from the Cypress Creek PMR were transferred onto the project mapping in Geographic Information Systems (GIS). A comparative analysis of the June 18, 2007 effective flood boundaries and the Cypress Creek PMR flood boundaries indicate changes to the amount of 100-yr (1% occurrence probability) floodplain encroachment for both the various alternative corridors and the alternative alignments within the preferred corridor. . . The 100-yr floodplain acreage was not the primary reason for the selection of a preferred corridor within Reach 2, and the increase in the amounts of 100-yr floodplain acreage due to the Cypress Creek PMR would not change the reasons for the selection of a preferred corridor within Reach 2.

> *Re-evaluation of the Final Environmental Impact Statement*, June 2009, Document 702, AR023736-AR023737. *See also Revised ROD*, Document 706, AR023863-AR23864.

The FHWA's final decision then relied upon the August 19, 2008 map, as approved by the HCFCD. The new mapping was used by FHWA in deciding if any impacts were found to be significantly different from those FEIS. *See* Revised ROD, Document 706, AR024860-AR024864. While the floodplain boundaries did change, no substantially different impacts were

- 20 -

noted. The data from the FEIS, and the decision reached in the original ROD, were found still to be valid. *Id.* Finally, the court should note that the FEMA mapping project of Cypress Creek is still not completed.[12]

Finally, in regards to considering an agency's review of environmental impacts, a court's duty is to ensure that the federal agency took a "hard look" at the environmental consequences of the proposed action. *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1541 (11th Cir.1990). This duty requires the court to consider not only the final documents prepared by the agency, but to consider the entire administrative record upon which the decision was made. *Mo. Coalition for the Env't v. Corps of Eng'rs of the U.S. Army*, 866 F.2d 1025, 1031 (8th Cir.1989). The CEQ regulations specify that an agency's consideration of impacts in the NEPA document should be based on sound methodology and scientific accuracy:

> Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

40 C.F.R. § 1502.24

Overall, "[b]ecause analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies." *Earth Island Inst. v. Forest Service*, 351 F.3d 1291, 1301 (9th Cir. 2003), *citing*, *Marsh*, 490 U.S. at 377. The

---

[12] See *Sierra Club v. Federal Emergency Management Agency*, Civil Action H-07-0608 (SD Tex.)(On Oct. 15, 2009, Judge Rosenthal entered an unopposed order issuing a stay until April 2010 – See Dkt No. 76). The court can also see the timeline of events regarding the floodplain mapping issue in AR Document No. 691.

record in this case shows more than adequate review and consideration of all of the potential water impacts.

3.      Potential Impacts and Effects on Wetlands were Fully Evaluated

The Federal Defendants recognize that they must identify and disclose potential impacts on wetlands in the project area. Besides stating that FHWA did not comply with this requirement, Plaintiff offers little else in his complaint to verify this allegation. Again, the Record shows compliance with NEPA given the depth and breadth of the review conducted here.

First, even a cursory review of the Record shows vast amount of communication, reports, analysis and coordination occurred on the wetlands issues. A short list of references from the Record, with some annotation, include: Doc. No.'s 7, 13, 18, 35 (discussion of wetlands held in pre-scoping meeting in 1993), 58 (notes wetlands delineation and mitigation discussion in 1995 with Fish and Wildlife representative), 63, 66, 69, 71, 75 (acres of potential wetlands in area noted in initial report from 1997), 81, 82 (shows coordination process with Army Corps of Engineers), 95, 96, 291 (initial discussion/report on potential alternatives and wetlands impacts), 49, 495, 498, 499 (in 2004 expert notes potential discrepancy in delineation of wetlands)(499 attached as Exhibit A), 520, 533 (revised delineation report on wetlands issued), 542 (initial Army Corps of Engineers approval of wetlands studies), 554 (white paper on wetlands and potential indirect/cumulative impacts), 561 and 690.

Next, a review of the FEIS shows that wetlands and potential impacts from the project (direct, indirect and cumulatively) were fully discussed and evaluated. At the very beginning of the document it notes that the selection of a Recommended Alternative Alignment is using a screening process focused on three criteria: Feedback from Public Workshops; Potential to

Impact Floodplains/Floodways; and Potential to Impact Wetlands. Doc. No. 624, AR 017865.

The FEIS goes on to evaluate each potential alternative and its potential impacts on the area's

wetlands. *See*, FEIS, Doc. No. 624, AR 018356-018357. The FEIS also evaluates the scope and

reach of various types of wetlands in the project area. Doc No. 624, AR 018390-018395, AR

018397-018398, AR 018491-018504 (discussion of environmental consequences of project,

including indirect effects, on wetlands and also mitigation issues),   AR 018561-018565

(mitigation commitments). In the FEIS summary it reports that:

> After publication of the DEIS and selection of a Preferred Alternative Alignment, a fourth level of investigation of wetlands within the alignment took place in order to best present projected impacts due to the proposed project. This investigation consisted of a formal wetland delineation conducted in December 2003 and January 2004 of the Preferred Alternative Alignment. Right-of-entry was denied on only three privately-owned properties totaling approximately 6 percent of the total project area along the Segment E Preferred Alternative Alignment. In lieu of a field survey, color infrared aerial photographs of these three tracts of land were reviewed and interpreted. There were no potential wetlands or other Waters of the U.S. identified on these properties. Results of the formal wetland delineation showed that the Preferred Alternative Alignment would impact 42.86 acres of wetland, including 25.70 adjacent wetland acres and 17.16 isolated wetland acres. Of the total, 40.83 acres consist of non-forested wetlands, while forested wetlands comprise the remaining 2.03 acres of potential impact. Impact calculations do not account for bridging, which would likely reduce the wetland acreage impact particularly in the vicinity of South Mayde Creek and Cypress Creek.

> FEIS, Doc no. 624, AR 017872.

Once the FEIS was completed FHWA issued its ROD in June 2008. See Doc. No. 668. In

pertinent part the ROD noted the wetlands impacts:

> The Selected Alternative encompasses 693.1 acres. Ninety-seven percent, or 675.6 acres, has designated vegetative land covers. This acreage has the following breakdown by vegetative community type: 174.2 acres of farmland, 436.0 acres of rangeland, 20.7 acres of forest, 40.8 acres of nonforested wetland, and 2.0 acres of forested wetland. Of the forested land cover, 4.9 acres will be riparian forest. . .

> Every effort has been made to avoid and minimize wetland impacts, both adjacent
> and isolated, to the extent practicable during the planning process. This effort will
> continue through construction of the Grand Parkway Segment E project. . .
> Impacts that cannot be avoided or further minimized will be mitigated per the
> project mitigation plan as approved by the USACE.
> ROD, Doc. No. 668, AR 023206-023208.

As with the other environmental issues wetlands were also reconsidered during of the re-evaluation process. Re-Evaluation, Doc. No. 702, AR 023735-023736. While no major new or different impacts were found the Re-Evaluation again committed to avoiding impacts where possible and exploring any new impacts with the Army Corps of Engineers during the required permitting process. This commitment was again verified in the Revised ROD issued by FHWA in June 2009. See, Revised ROD, Doc. No. 706.

Again, the record in this case shows more than an adequate review and consideration of all of the potential wetlands impacts.

4. The Project's Air Quality Impacts were Fully Evaluated

Although the plaintiff alleges that the Federal Defendants failed to consider the possible impacts of the Project on air quality, the administrative record is replete with evidence that defendants considered the air quality impacts comprehensively and professionally. The defendants have, in fact, taken the required "hard look" pursuant to the relevant NEPA guidance at the project's impacts on air quality. *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000).

Plaintiff's complaint and allegations, that Defendants failed to disclose "significant" health impacts or effects in, is extraordinarily artful, because there is no law, statute, regulation or programmatic guidance which requires discussion of any the alleged negative health effects of

- 24 -

the specific air issues. Plaintiff's argument could require that a "worst case analysis" be conducted. This is clearly not required under NEPA. *Methow Valley,* 490 U.S. at 354-356.

At every stage of the Project, and throughout the environmental review process, particularly in the FEIS, the Federal Defendants thoroughly evaluated the air quality issues. FEIS, Doc. No. 624, AR 017870, AR 017982-017990, AR 018375- 018382, AR 018547-018548, The EPA classified the Houston-Galveston area, which includes Harris County, as a moderate $O_3$ non-attainment area (EPA, 2006a). Currently, the Houston area exceeds the national $O_3$ standard for about 40 days per year. The Houston area is in attainment for all other NAAQS.

The defendants' analysis of air quality impacts is closely intertwined with the EPA's regulation of air pollutants. Air pollutants are regulated by the EPA and individual states under the Clean Air Act (CAA), 42 U.S.C. §§ 7410-77671q. Under the CAA, the EPA identifies air pollutants that endanger the public health and welfare and sets exposure levels where potential threats to human health occur in the National Ambient Air Quality Standards (NAAQS). The NAAQS specifies the maximum permissible concentrations of those pollutants in the ambient air. 42 U.S.C. §§7408-7409. While EPA has identified air toxics they still have not issued any health effects determinations. Agencies, such as FHWA, are required to study and determine the types and potential amounts of criteria pollutants but we have no tools or guidance so as to determine any accurate measure of a potential effect.

As is noted in the FEIS :

Recent studies have been reported to show that proximity to roadways is related to negative health outcomes, particularly respiratory problems (South Coast Air Quality Management District, 2000; Sierra Club, 2004; Environmental Law Institute, 2005). Most studies have encompassed the full spectrum of both criteria pollutants and other pollutants including MSAT. Thus, it is difficult to determine

- 25 -

whether it is MSAT that are responsible for the health outcomes, or whether it is the criteria pollutants, or possibly some other effects, that are responsible for the health outcomes.  . . . Sensitive receptors were mapped and entered to the project GIS. Exhibit E–26 depicts sensitive receptors that were considered within and adjacent to the Segment E project area; these receptors include all public and private schools, hospitals, senior citizen care facilities, and licensed daycare facilities.

Doc. No. 624, AR 018381.

Once a NAAQS for a particular pollutant is set, the EPA and the states designate areas which fail to meet any one of the standards. *Id.* at 7407(d)(10-(2). After an area is designated as "non-attainment" the particular state must adopt a State Implementation Plan (SIP) designed to bring those areas into conformity with the NAAQS. *Id.* at 7410(a)(1). The EPA has classified the Houston-Galveston area, which includes Harris County, as a moderate O3 non-attainment area (EPA, 2006a). Currently, the Houston area exceeds the national O3 standard for about 40 days per year. The Houston area is in attainment for all other NAAQS.

The Project is part of the current air-quality-standard conforming Houston Galveston 2035 Metropolitan Transportation Plan (MTP) and Fiscal Year 2007-11 Transportation Improvement Program (TIP).  The Project's conformity determination is required under federal law. 42 U.S.C. §7506(c)(2). On August 24, 2007 H-GAC adopted the 2035 RTP and FY 2008 – 2011 TIP. The U.S. Department of Transportation (FHWA/FTA) found the 2035 RTP and 2008 – 2011 TIP to conform to the SIP on November 9, 2007.  The air quality analysis has determined that the Segment E project will not produce additional air quality impacts in the Houston area. *See* ROD, Doc. No. 668, AR 023202-023204.

The record shows that the Federal Defendants have fully considered, evaluated and reported on air quality issues and air toxics. In the instant case, Plaintiff's complaint cites no

evidence or information sufficient to conclude that any decisions or findings, regarding air quality issues, were in any way arbitrary, capricious, an abuse of discretion or not in accordance with law.  Plaintiff, rather, simply seem to advance their opinion that Defendants made an incorrect scientific determination based on the factual record.  Such arguments, even if correct, are not properly cognizable under NEPA, mandating summary disposition in favor of the Federal Defendants.

5.      Noise Impacts Studies and Findings are in Compliance with NEPA

        Title 23, United States Code, Section 109(h), requires the Secretary of Transportation to address various environmental impacts from highway projects, including "noise . . . pollution." Section109(h) grants great latitude to FHWA in establishing noise abatement requirements. Section 109(h) mandates that noise impacts be "fully considered" in the development of a project, but the final decision must weigh factors, including costs, and ultimately be made in "best overall public interest." Section 109(i) deals specifically with noise and directs the Secretary to "not approve plans and specifications for any proposed project . . . unless he determines that such pimps and specifications include adequate measures to implement the appropriate noise level standards." FHWA's regulations implementing the statute can be found at 23 C.F.R. Part 772, (referred to as the noise abatement program).

        According to the FHWA regulations the agency must first determine whether there are "traffic noise impacts." 23 C.F.R. § 772.5(g). According to section 772.5(g), "traffic noise impacts" occur "when the predicted traffic noise levels approach or exceed the noise abatement criteria, or when the predicted traffic noise levels substantially exceed the existing noise levels." The potential noise impacts and analysis are discussed throughout the DEIS and particularly in

the FEIS.  *See, e.g.*, AR 017870-017871, AR 017886 (summary sheet of impacts), AR017990-017991, AR 018045, AR 018353, AR 018382-018385 (existing noise measures), AR 018475-018483 (traffic projections noise estimates), AR 018548, and AR 018559-018660. Noise issues were also addressed in response to public comments. *See* AR 019254, AR019259-019260, and AR 019261. The FHWA Traffic Noise Model is used to analyze existing and predicted noise levels. If a receiver will be impacted by noise, noise mitigation has been considered. The construction of noise abatement barriers then is evaluated in areas where the construction of these barriers would be both reasonable and feasible. The FEIS noted the specific process that was followed in this project:

> A preliminary noise analysis was performed in 2002 for the preparation of the Segment E DEIS to determine the anticipated (model predicted) impacts from future traffic-generated noise levels at representative receiver locations along each of the alternative alignments within Segment E of the Grand Parkway project. Since the selection of the Preferred Alternative Alignment, a subsequent detailed analysis was performed at representative receiver locations along the Preferred Alternative Alignment in July 2006 (Exhibit E–53). Both analyses were accomplished in accordance with TxDOT's (FHWA approved) *Guidelines for Analysis and Abatement of Highway Traffic Noise*. Existing noise levels were determined through a noise measurement program (Section 3.7.1) and predicted (future) noise levels were determined through modeling with the FHWA approved Traffic Noise Model (TNM).

Doc. No. 624, AR 018475.

Land use within the area studied for Segment E project area was found to be dominated by agricultural uses and was relatively undeveloped. *See* AR 018478. Therefore, very few noise impacts are predicted for any of the alternative alignments and specifically for the preferred alignment. *Id.* Results of the traffic noise analysis for the Preferred Alternative Alignment did indicate that nine receivers (representing a total of 11 residences) would be impacted by traffic

- 28 -

noise. Noise abatement measures were then evaluated for each of the impacted receivers. However, based on the reasonableness (cost) and effectiveness (reduction), no noise abatement procedures (walls, berms, etc.) were proposed for the Segment E. *See* AR 018481.

The record shows that the Federal Defendants have fully considered, evaluated and reported on noise issues. Again, in the instant case, Plaintiff's complaint cites no evidence or information sufficient to conclude that any decision regarding noise and noise abatement were in any way arbitrary, capricious, an abuse of discretion or not in accordance with law.  Federal Defendants are entitled to summary judgment on this issue.

6.    Indirect and Cumulative Impacts were Fully Analyzed and Considered

NEPA, does not include any specific references to indirect or cumulative impacts. The Council on Environmental Quality (CEQ) clarified the meaning when it issued its NEPA regulation in 1978. The CEQ says direct effects "…are caused by the action and occur at the same time and place." Indirect effects "…are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." Moreover, indirect effects "…may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." The CEQ differentiates direct and indirect effects from the term cumulative impact. A cumulative impact "…is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions…" *(CEQ 1986).*

The analysis completed for Segment E on indirect and cumulative impacts followed the requirements and processes outlined in 23 C.F.R. § 771, the FHWA Technical Advisory T

- 29 -

6640.8A (1987), CEQ's handbook, *Considering Cumulative Effects Under the National Environmental Policy Act* (CEQ, 1997), *Questions and Answers Regarding the Consideration of Indirect and Cumulative Impacts in the NEPA Process* (FHWA, 2003), CEQ's Memorandum *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis* (CEQ, 2005), *National Highway Cooperative Research Program Report 466 Desk Reference for Estimating the Indirect Effects of Proposed Transportation Projects*. (Transportation Research Board, National Research Council Washington, D.C.: National Academy Press, 2002), and TxDOT's *Guidance on Preparing Indirect and Cumulative Impact Analyses* (TxDOT, 2006b).

Indirect and cumulative impacts merited great study for this project so these issues were given their own section in each of the volumes of the FEIS and before that in the DEIS. In Volume no. 1 of the FEIS (which looked at the broader region of the planned Grand Parkway) the discussion can be found in section 4. AR 018028-018097. It is reproduced almost verbatim in section 5 of Volume 2. See AR  018570-018639. This expansive look at the project's impacts was meant to ensure that there was no arbitrary or small window to look at the potential impacts.

Without some specific allegation as to what is improper in this section of the FEIS and the ROD's decision it is difficult to respond. However, a considering the Record, and particularly the environmental documents shows that FHWA properly considered and evaluated the potential indirect and cumulative impacts of the proposed project. The Federal Defendants are entitled to a summary judgment on this issue.

## VIII.  CONCLUSION

The Federal Defendants request that this court find that they have fully met their obligations under NEPA, that they be granted summary judgment on all issues, that the case be

dismissed, and further that they be granted all such other and further relief to which they may be

entitled.

Respectfully submitted,
TIM JOHNSON
United States Attorney

By:
/S/___Jack F. Gilbert_____

Jack F. Gilbert
Special Assistant United States Attorney
Texas Bar No. 00786946
60 Forsyth St., SW  suite 8M5
Atlanta, GA 30303
Ph. (404) 562-3924
Fax: (404) 562-3702
Email: jack.gilbert@dot.gov
Attorney-in-Charge for Federal Defendants

Of Counsel:

Keith Edward Wyatt
Assistant United States Attorney
Texas Bar No. 22092900
Federal Bar No. 3480
P. O. Box 61129
Houston, Texas 77208
Telephone: (713) 567-9713/Fax: (713) 718-3303

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of January 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to

- 31 -

the following: Marisa Perales, LOWERRE, FREDERICK, PERALES, ALLMON & ROCKWELL, 707 Rio Grande, Ste. 200, Austin, TX 78701; Brad Rockwell, LOWERRE, FREDERICK, PERALES, ALLMON & ROCKWELL, 707 Rio Grande, Ste. 200, Austin, TX 78701; Lisa McClain, OFFICE Of The TEXAS ATTORNEY GENERAL, Transportation Division (020), P.O. Box 12548 Austin, Texas 78711-2548.

_____/s/_____
Jack F. Gilbert
Special Assistant US Attorney