IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SIERRA CLUB, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES FEDERAL HIGHWAY | § | |
| ADMINISTRATION; JANICE W. BROWN, | § | |
| IN HER OFFICIAL CAPACITY AS | § | |
| DIVISION ADMINISTRATOR OF THE | § | |
| FEDERAL HIGHWAY | § | |
| ADMINISTRATION, TEXAS DIVISION; | § | |
| JEFFREY F. PANIATI, P.E., IN HIS | § | |
| OFFICIAL CAPACITY AS | § | |
| ADMINISTRATOR OF THE FEDERAL | § | |
| HIGHWAY ADMINISTRATION; UNITED | § | Civil Action No. 4:09-cv-00692 |
| STATES DEPARTMENT OF | § | |
| TRANSPORTATION; RAY LaHOOD, IN | § | |
| HIS OFFICIAL CAPACITY AS | § | |
| SECRETARY OF TRANSPORTATION OF | § | |
| THE UNITED STATES DEPARTMENT | § | |
| OF TRANSPORTATION; TEXAS | § | |
| TRANSPORTATION COMMISSION; AND | § | |
| DEIRDRE DELISI, IN HER OFFICIAL | § | |
| CAPACITY AS CHAIR OF THE TEXAS | § | |
| TRANSPORTATION COMMISSION, | § | |
| *Defendants*. | § | |

---

**DEFENDANTS' JOINT RESPONSE
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

I.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Plaintiff's Motion for Summary Judgment includes extra-record materials that should not be considered in this Administrative Procedure Act proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  History of the environmental documents in this case . . . . . . . . . . . . . . . . . . . 3

    C.  The Final Environmental Impact Statement contains a fully compliant discussion of floodplains and drainage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.  History of the best available floodplain data . . . . . . . . . . . . . . . . . . . . 4

        2.  Defendants properly applied the best available floodplain data . . . . . . . 5

        3.  Defendants thoroughly analyzed potential direct and indirect impacts on floodplains . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        4.  Plaintiff's assertions about Defendants' consultants are mere speculation and designed to confuse the issues . . . . . . . . . . . . . . . . . . . 13

    D.  Based upon the clear and justified statement of the Project's Purpose and Need a reasonable range of alternatives was analyzed . . . . . . . . . . . . . . . . 15

        1.  The Guidance issued by FHWA serves to assure compliance with the NEPA requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        2.  The Purpose and Needs identified in the NEPA documents permitted a full exploration of reasonable alternatives . . . . . . . . . . . . . 18

        3.  The Alternatives Analysis conducted in the DEIS and FEIS is both reasonable and sufficient under NEPA requirements . . . . . . . . . . . . . . 22

        4.  Defendants considered a full range of reasonable alternatives . . . . . . . 26

    E.  The Wetlands analysis fully complies with NEPA requirements. . . . . . . . . . . 28

ii

F.    Defendants considered and disclosed all impacts as required by NEPA. . . . . . . 32

1.    PM 2.5 was adequately considered and disclosed. . . . . . . . . . . . . . . . . 32

2.    Air and health effects were adequately considered and disclosed. . . . . . 33

3.    Greenhouse gas emissions were adequately considered and disclosed. . . 34

II.    CONCLUSION AND PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## INDEX OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Airport Neighbors Alliance, Inc., v. U.S.*, 90 F.3d 426 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . 28

*Alliance for Legal Action v. Fed. Aviation Admin.,* 69 Fed. App'x 617 (4th Cir. 2003) . . . . 18, 19

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.,*
   745 F.2d 677 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Atlanta Coal. on the Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n,* 599 F.2d 1333
   (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Camp v. Pitts*, 411 U.S. 138, 93 S. Ct. 1241 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 13

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) . . . . . . . . . . . . 18, 26

*City of Alexandria v. Slater*, 198 F.3d 862 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . 18, 19, 26, 28

*City of Angoon v. Hodel,* 803 F.2d 1016 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142 (9th Cir. 1997) . . . . . . . . 26

*City of Shoreacres v. Waterworth*, 332 F. Supp. 2d 992 (S.D. Tex. 2004) . . . . . . . . . . . . . . 10, 30

*Clairton Sportsmen's Club v. Pa. Turnpike Comm'n,*
   882 F. Supp. 455 (W.D. Pa. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 202 F. Supp. 2d 594
   (W.D. Tex. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Davis v. Latschar*, 202 F.3d 359 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Druid Hills Civic Ass'n v. Fed. Highway Admin.*, 772 F.2d 700 (11th Cir. 1985) . . . . . . . . . . . 2

*Fla. Power & Light Co. v. Lorian*, 470 U.S. 729, 105 S. Ct. 1598 (1985) . . . . . . . . . . . . . . . 2, 29

*Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283 (4th Cir. 1999) . . . . . . . . . . . 3

*Kleppe v. Sierra Club*, 427 U.S. 390, 96 S. Ct. 2718 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . 10, 30

iv

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517 (9th Cir. 1994) . . . . . . . . . . 27, 31

*Lee v. U.S. Air Force*, 354 F.3d 1229 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Marsh v. Oregon Nat. Res. Council,* 490 U.S. 360, 373, 109 S. Ct. 1851 (1989) . . . . . . . . 19, 34

*Nat'l Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d 1274 (E.D. Cal. 2000) . . . . . . . . . . . . . . . . . 10

*Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 1233 (9th Cir. 2005) . . . . . . . . 3, 6, 7

*N.C. Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp.*,
    151 F. Supp. 2d 661 (M.D. N.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*North Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147 (9th Cir. 2008) . . . 11

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009) . . . . . . . . . . . . . 3

*Route 9 Opposition Legal Fund v. Mineta,* 213 F. Supp. 2d 637 (N.D. W. Va. 2002) . . . . . . . . 18

*Senville v. Peters*, 327 F. Supp. 2d 335 (D. Vt. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Sierra Club v. Fed. Emergency Mgmt. Agency,* Court Advisory, No. H-07-608
    (S.D. Tex. filed Feb. 15, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, Tab App. G

*Sierra Club v. Froehlke,* 816 F.2d 205 (5th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Sierra Club v. U.S. Dep't of Transp.,* 310 F. Supp. 2d 1168 (D. Nev. 2004) . . . . . . . . . . . . . . 34

*Sierra Club v. U.S. Dep't of Transp.*, 962 F. Supp. 1037 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . 33

*Young v. Gen. Servs. Admin.,* 99 F. Supp. 2d 59 (D. D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . 27

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*,
    435 U.S. 519, 98 S.Ct. 1197 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Constitutional Provisions, Statutes, and Rules**

23 C.F.R. § 650.111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, Tab App. E

23 C.F.R. §§ 771.101-771.137 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, Tab App. I

23 C.F.R. § 771.105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, Tab App. I

23 C.F.R. § 771.109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, Tab App. I

40 C.F.R. §§ 1500-1508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15, 33 Tab App. C

40 C.F.R. § 1502.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, Tab App. C

43 TEX. ADMIN. CODE § 2.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, Tab App. F

23 U.S.C. §§ 134-135 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

23 U.S.C. § 138 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

49 U.S.C. §§ 5303-5306 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Exec. Order 11,988, 42 F.R. 26951 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 8, Tab App. D

**Other**

*Guidance Material for the Preparation of Environmental and Section 4(f)*
 *Documents,* FHWA Technical Advisory T 6640.8A, (Oct. 30, 1987) . . . . . . 7, 16, Tab App. H

*TxDOT Guidance on Purpose and Need* (2001) . . . . . . . . . . . . . . . . . . . . . . . . 17, Tab App. L

*Guidance on Purpose and Need* (2003) and CEQ Chairman James
 Connaughton's letter dated May 12, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, Tab App. M

*Integration of Planning and NEPA Processes* (2005) . . . . . . . . . . . . . . . . . . . . . . . 17, Tab App. J

*Purpose and Need in Environmental Documents* (1990) . . . . . . . . . . . . . . . . . 16, 17, Tab App. K

*TxDOT Landscape and Aesthetics Design Manual* (Nov. 1, 2009) . . . . . . . . . . . . 3, Tab App. A

*TxDOT Project Development Process Manual* (Nov. 1, 2009) . . . . . . . . . . . . . . . 3, Tab App. B

*Desk Reference for Estimating the Indirect Effect of Proposed Transportation Project*:
 *National Cooperative Highway Research Report (NCHRP) 466* (2002) . . . . . . . . . . . . . . . . . 24

**Exhibits**

Affidavit of Gregory S. Punske, P.E . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exh. Tab A

Affidavit of Michael Leary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exh. Tab B

**Appendices**

*TxDOT Landscape and Aesthetics Design Manual* (Nov. 1, 2009) . . . . . . . . . . . . . . Tab App. A

*TxDOT Project Development Process Manual* (Nov. 1, 2009) . . . . . . . . . . . . . . . . . Tab App. B

40 C.F.R. §§ 1500-1508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab App. C

Exec. Order 11,988, 42 F.R. 26951 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab App. D

23 C.F.R. § 650.111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab App. E

43 TEX. ADMIN. CODE § 2.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab App. F

*Sierra Club v. Fed. Emergency Mgmt. Agency,* Court Advisory, No. H-07-608
   (S.D. Tex. filed Feb. 15, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab App. G

*Guidance Material for the Preparation of Environmental and Section 4(f)
   Documents,* FHWA Technical Advisory T 6640.8A, (Oct. 30, 1987) . . . . . . . . . . Tab App. H

23 C.F.R. §§ 771.101-771.137 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab App. I

*Integration of Planning and NEPA Processes* (2005) . . . . . . . . . . . . . . . . . . . . . . . . . Tab App. J

*Purpose and Need in Environmental Documents* (1990) . . . . . . . . . . . . . . . . . . . . . . . Tab App. K

*TxDOT Guidance on Purpose and Need* (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab App. L

*Guidance on Purpose and Need* (2003) and CEQ Chairman James Connaughton's
   letter dated May 12, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab App. M

**DEFENDANTS' JOINT RESPONSE**
**TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

NOW COME the United States Federal Highway Administration ("FHWA"), Janice W. Brown in her official capacity as Division Administrator of FHWA, Texas Division, Jeffrey F. Paniati, P.E., in his official capacity as the Administrator of FHWA,[1] Ray LaHood, in his official capacity as Secretary of Transportation of the United States Department of Transportation, the Texas Transportation Commission, and Deirdre Delisi in her official capacity as Chair of the Texas Transportation Commission (collectively "Defendants") in the above-styled and captioned cause, by and through the undersigned counsel and files this Defendants' Joint Response to Plaintiff's[2] Corrected Motion for Summary Judgment.[3]

## I. ARGUMENT

### A. Plaintiff's Motion for Summary Judgment includes extra-record materials that should not be considered in this Administrative Procedure Act proceeding.

Defendants renew and incorporate in its entirety Defendants' Joint Motion to Strike (Dkt. No. 52), and Defendants continue to object to the consideration of the extra-record materials offered by Plaintiff in Docket ("Dkt.") Nos. 50 through 50-3 in this Administrative Procedure Act ("APA") case. The materials Plaintiff submitted as summary judgment evidence are not part of the

---

[1]The current Administrator of FHWA is Victor Mendez. Mr. Mendez assumed the role of Administrator on July 17, 2009.

[2]To date, Plaintiff has not filed its First Amended Complaint to add Houston Audubon as a Plaintiff.

[3]Plaintiff has filed its Motion for Summary Judgment three times: first, timely filed January 20, 2010 (Docket ("Dkt.") No. 47); second, filed January 20, 2010 (Dkt. No. 48), apparently re-filed to add the Certificate of Service and Proposed Order; and third, filed a corrected Motion for Summary Judgment January 22, 2010 (Dkt. No. 51). For purposes of this Response, Defendants are responding to the most recently-filed Plaintiffs' Motion for Summary Judgment (hereinafter Pl's. Corr. Mot. Summ. J.) (Dkt. 51), which surprisingly included approximately 20 new citations, and the attachments in Dkt. Nos. 50 through 50-3, filed on January 21, 2010. Defendants maintain that the late-filed Dkt. Nos. 50 through 50-3 are outside the Administrative Record in this case and therefore Defendants object to the consideration by the Court of those documents in determining whether Defendants complied with NEPA.

Administrative Record in this case.  The additional materials add nothing to inform the Court's decision about Defendants' compliance with the APA and the National Environmental Policy Act ("NEPA").  A reviewing court is to rely on the agency's record.  *See Fla. Power & Light Co. v. Lorian*, 470 U.S. 729, 743-44, 105 S. Ct. 1598, 1607 (1985) (APA requires court to limit its review to materials contained in administrative record prepared by agency); *Camp v. Pitts*, 411 U.S. 138, 142, 93 S. Ct. 1241, 1244 (1973) (focal point of judicial review should be administrative record already in existence, not some new record made initially in reviewing court).

The agency decisions in this case are based on technical modeling and expert analysis, and a court's role is not to choose between differing studies or differing expert views.  A federal court does not sit as a "super professional transportation analyst" to decide which party used better methodology in reaching its conclusions.  *Druid Hills Civic Ass'n v. Fed. Highway Admin.*, 772 F.2d 700, 709 (11th Cir. 1985).  Rather, a district court simply determines whether an agency's methodology has a rational basis and is consistently applied.  *Id.  See also Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004) (agencies are entitled to rely on own experts so long as decisions are not arbitrary or capricious).

The three affidavits purportedly offered to demonstrate standing, Pl's Resp. to Mot. to Strike 1, n.1 (Dkt. No. 54), are unnecessary as no Defendant has challenged Sierra Club's standing to pursue this matter.  Indeed, none of those three affidavits are even mentioned – nor is the issue of standing briefed – in any of the versions of Plaintiff's Motion for Summary Judgment with which the affidavits are associated.  The affidavits and materials of Dr. Susan Handy and Larry Dunbar lay the groundwork for an impermissible battle of the experts and should be rejected by the Court.[4]  *See*

---

[4]Plaintiff also offers a Compensatory Mitigation Plan, but it need not be included in the Administrative Record because that plan was completed after the Record of Decision ("ROD") was signed, and final mitigation decisions are made during the final design process, well after the NEPA decision has been made.

*Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289-90 (4th Cir. 1999) (consideration of extra-record materials does not allow courts to substitute judgment of plaintiff's experts for that of agency's experts); *and see Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 201 (4th Cir. 2009) (decision-making agency and its chosen methodology are entitled to deference).   Here, Defendants have provided a thorough explanation—in the FEIS and ROD, and its Re-Evaluation and Revised ROD—for its actions and demonstrated that they acted reasonably, therefore the Court should not take part in a battle of the experts.   *See Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 1233, 1244 (9th Cir. 2005).

Because Plaintiff has presented the Court with five affidavits, two of which are made by hired experts and present new information, Defendants are compelled to rebut the assertions of Plaintiff's experts.   Defendants, however, offer no new information through the affidavits of Gregory S. Punske, P.E., FHWA District Engineer, District B (South), Texas Division (Exh. A), and Michael Leary, FHWA Director of Planning and Program Development, Texas Division (Exh. B), but merely answer Plaintiff's allegations using support from the Administrative Record.

**B.**      **History of the environmental documents in this case.**

This case involves a multitude of documents.   The documents discussed in this Response are listed here chronologically for ease of reference in navigating the discussion of these documents and the Administrative Record supporting these decisions:

---

*See Camp v. Pitts*, 411 U.S. 138, 142, 93 S. Ct. 1241, 1244 (1973) (court to consider record before agency at time agency made decision); *see also* App. A: *TxDOT Landscape and Aesthetics Design Manual*, Nov. 1, 2009, Chapter 3: Project Development Process, Section 4: PS&E Development, Subsection 5100: Design Environmental Mitigation Details; also available at http://onlinemanuals.txdot.gov/txdotmanuals/lad/lad.pdf last accessed February 11, 2010; *see also* App. B : *TxDOT Project Development Process Manual*, Nov. 1, 2009, Chapter 5: PS&E Development, Section 2: Begin Detailed Design; also available at http://onlinemanuals.txdot.gov/txdotmanuals/pdp/pdp.pdf last accessed February 11, 2010.   TxDOT's Project Development Process occurs generally in this order: (1) planning and programming; (2) preliminary design; (3) environmental; (4) right of way utilities; (5) PS&E development; (6) letting.   *See* App. B: *TxDOT Project Development Process Manual*, Preface p. 11.

January 16, 2003
•        Draft Environmental Impact Statement approved by FHWA.  Doc. No. 411,
         AR 009035-AR 009923**.**

November 19, 2007
•        Final Environmental Impact Statement signed by FHWA.  Doc. No. 624,
         AR 017849-AR 20971**.**

June 24, 2008
•        Record of Decision issued by FHWA.  Doc. No. 668,
         AR 023191-AR 023258**.**

June 5, 2009
•        Re-Evaluation of FEIS completed.  Doc. No. 702, AR 023718-AR 023773**.**

June 9, 2009
•        Revised ROD signed by FHWA.  Doc. No. 706, AR 024855-AR 025009**.**

**C.      The Final Environmental Impact Statement contains a fully compliant
         discussion of floodplains and drainage.**

         Defendants fully complied with all applicable laws and regulations in conducting their

floodplain and drainage analyses.  The FEIS, as demonstrated by the myriad supporting documents

in the Administrative Record, is compliant with federal laws and regulations, including, but not

limited to: NEPA; the APA; 40 C.F.R. 1502 (Environmental Impact Statement), App. A; Executive

Order 11,988, 42 F.R. 26951 (1977) (Floodplain Management) ("EO 11988"), App. D; and 23 C.F.R.

Part 650 Subpart A (Bridges, Structures, and Hydraulics: Location and Hydraulic Design of

Encroachments on Flood Plains), App. C.

                **1.       History of the best available floodplain data.**

         To this day, the Physical Map Revision ("PMR") for Cypress Creek remains pending with

FEMA,[5] thus the best data available (described in detail below) is to be used until the PMR is

approved.  The Administrative Record fully explains the history of the floodplain data used in each

_____

[5]Court Advisory, in *Sierra Club v. Fed. Emergency Mgmt. Agency, et. al.*, Civil Action No. H-07-608 at 5.
App. G.

                                          4

stage of the environmental document development for Segment E.  *See* Affidavit of Gregory S. Punske ("Punske Aff.") ¶¶ 6, 8-12, Exh. A.  A full Chronology of the Cypress Creek PMR is included in the Administrative Record.  *See* Doc. No. 691, AR 023512-AR 023518 ("Chronology"). Plaintiff attempts to obfuscate the sequence of events, but the Chronology makes clear that at all times, Defendants used the best available floodplain data in their analyses.  The Chronology and Punske Affidavit, Exh. A, delineate the history and so it will not be repeated here, but the dates central to this discussion are:

- 2004: Harris County Flood Control District ("District") releases Flood Hazard Recovery Data as "best data" for Cypress Creek.  Harris County Commissioner's Court instructs Harris County to use the new data, along with the older, effective FIRM data, in conducting its permitting processes.  Doc. No. 691, AR 023513.

- 2007: "Best data" released in 2004 is made effective by the Federal Emergency Management Agency ("FEMA").  Doc. No. 730,  AR 026437.

- 2008: Harris County Commissioners' Court adopts revised floodplain map information, Doc. No. 691, AR 023518, and Doc. No. 703, AR 023784, based on additional study subsequent to the study used to establish the effective FIRM .  Doc. No. 691, AR 023517-AR 023518.[6]

- 2009: On June 8, 2009, FHWA issues a Revised ROD after Defendants complete a Re-Evaluation of their FEIS to consider the "best data." Doc. No 706, AR 024856-AR 025009.

### 2. Defendants properly applied the best available floodplain data.

Defendants followed applicable laws and regulations in their consideration and application of best available floodplain data.  Punske Aff. ¶¶ 7, 9, Exh. A; Doc. 691, AR 023512-AR 023518.

---

[6]Notably, Mr. Dunbar touts his involvement in the FEMA mapping process, yet Mr. Dunbar's submittal: "did not present an alternative analysis or superior information as required in the Appeal submittal" and was ultimately rejected because it "did not meet FEMA requirements to contain superior engineering data and/or analysis."  Doc. No. 691, AR 023514.

Title 23 Code of Federal Regulations ("C.F.R.") section 650.111, App. E, requires use of National Flood Insurance Program ("NFIP") maps (or Flood Insurance Rate Maps ("FIRMs")) in determining whether a highway location alternative will include an encroachment on a floodplain. If FIRMs are not available, information developed by the highway agency may be used. EO 11988 states that determinations shall be made using Department of Housing and Urban Development floodplain maps, or more detailed maps if available. App. D. If such maps are not available, EO 11988 instructs that the best available information is to be used. *Id.* The best available data in this case was the 2006 Preliminary FIRM showing the Cypress Creek floodplain and the subsequently released Flood Hazard Recovery Data for Cypress Creek. Punske Aff. ¶¶ 8, 9, Exh. A; Doc. 691, AR 023513.

The FEIS approved by the June 24, 2008 ROD examined and applied the 2006 Preliminary FIRM, which was the best available floodplain data at that time. Punske Aff. ¶ 6, Exh. A. The FEIS Re-Evaluation re-visited the effective FEMA data, and considered and analyzed the latest floodplain data. Punske Aff. ¶ 11, Exh. A, Doc. No. 691, AR 023518.

Despite these facts, Plaintiff maintains that Defendants used inaccurate and misleading floodplain data in its analyses. Plaintiff relies on *Native Ecosystems Council v. United States Forest Service*, 418 F.3d 953, 965 (9th Cir. 2005), for the proposition that agencies may not rely upon incorrect assumptions or data in an EIS. The court in *Native Ecosystems* held that the Forest Service's use of an unapproved hiding cover denominator in calculating an elk herd hiding cover percentage arbitrarily and capriciously skewed the EIS's elk herd hiding cover percentage. The facts of *Native Ecosystems* are distinguishable in that the Forest Service chose to use an unauthorized denominator. Here, Defendants used the best data available, which was authorized by FEMA and the Harris County Commissioners' Court, to analyze floodplain issues. Doc. No. 691, AR 023513, Doc. No. 706, AR 024860, AR 024971, AR 024997-AR 025000.

6

As noted above, the data used by Defendants was the currently approved FIRM, and when new Flood Hazard Recovery Data was released by the District, Defendants analyzed and applied that data to the floodplain analysis.  Punske Aff. ¶ 9, Exh. A, Doc. No. 706 AR 024860, AR 024971, AR 024997-025000.  At no time did the Defendants in this case alter the data, as was done in *Native Ecosystems* and in *North Carolina Alliance for Transportation Reform, Inc. v. United States Department of Transportation*, 151 F. Supp. 2d 661, 688 (M.D. N.C. 2001) (holding purposeful inclusion of inaccurate traffic volume projections violated NEPA).  Moreover, Defendants were under no obligation to mention in the FEIS that FEMA floodplain maps were under review at the District because the fact that the District is reviewing the data does not mean that the data has been impermissibly altered, as was true in *Native Ecosystems*, or that the data somehow falls short of being reliable.

In addition to using the best available data, Defendants performed a drainage impact study ("DIS") during the study process, the findings of which were incorporated into the FEIS.  Doc. No. 703, AR 023774-AR 024849.  The original DEIS was based on models and information presented in the previous effective FIRMs for the project area.  Doc. No. 412, AR 009924-AR 010024.  The DIS was revised to incorporate the changes to the floodplains made as a part of the Tropical Storm Allison Recovery Project ("TSARP")  and the related FIRM revisions , Doc. No. 703, AR 023774-AR 024849, which became effective June 18, 2007.  The DIS was continuously updated with its most recent findings implemented in the Revised ROD.  Doc. No. 703, 023774-AR 024849; Doc. No. 706, AR 024855-AR 025009.  The drainage impact study includes a detailed drainage design and mitigation analysis of the Preferred Alternative Alignment.  *Id.*; Doc. No. 703, AR 023791.  The floodplain assessment for the proposed project followed the guidance in FHWA Technical Advisory T6640.8A, Guidance for Preparing and Processing Environmental and Section 4(f) Documents

7

(FHWA, 1997).  App. H, Doc. No. 14, AR 000359-AR 000426.  The assessment methodology is based on the requirements provided in EO 11988 Floodplain Management, FHPM 6-7-3-2, Location and Hydraulic Design of Encroachments of Floodplains, and U.S. Department of Transportation 5650.2 Floodplain Management and Protection as referenced in the FEIS.  App. D, Doc. No. 624, AR 018038, AR 018046, AR 018516, AR 018518, AR 018580, AR 018588.

As part of the final design of the project, the updated DIS includes stream modeling and floodplain changes proposed as part of the Cypress Creek PMR, Doc. No. 703, AR 023774-AR 024849, which was adopted by the Harris County Commissioners' Court as the best available data for use on August 19, 2008.  Doc. No. 703, AR 023784.  As of the date of this response, the Cypress Creek PMR is still under review by FEMA.  *See* n.5, *supra.*

The floodplains and floodways from the Cypress Creek PMR were transferred onto the project mapping in Geographic Information Systems (GIS).  A comparative analysis of the June 18, 2007 effective flood boundaries and the Cypress Creek PMR flood boundaries indicate changes to the amount of 100-year (1% occurrence probability) floodplain encroachment for both the various alternative corridors and the alternative alignments within the preferred corridor.  Doc. No. 706, AR 024760-AR 024861.  The three original alternative alignments and the Preferred and Selected Alternative Alignments were quantitatively examined for encroachments on the Segment E project area's watercourses and associated floodplains.  Doc. No. 706, AR 024862.  This quantitative examination was repeated to include the floodplain revisions due to the Cypress Creek PMR.  Doc. No. 706, AR 024860, AR 024971, AR 024977-AR 025000.  Including the floodplain revisions done as a part of the Cypress Creek PMR, the Selected Alternative Alignment has the least potentially impacted area of floodway and floodplain of the alternatives examined.

8

Following the issuance of the ROD, Doc. No. 706, AR 024855-AR 025009, the District, which is the managing agency responsible for regulating hydrologic and hydraulic features within Harris County, performed a study of the Upper Cypress Creek watershed that resulted in a proposed Physical Map Revision (PMR).   This PMR is currently under review by Federal Emergency Management Agency (FEMA) and, once approved, will require that the associated Digital Flood Insurance Rate Maps (DFIRMs) are physically revised and republished.

As stated in the ROD, Doc. No. 706, AR 024855-AR 025009, hydrologic modeling was done for both the existing and build conditions.  A 10-year (10% occurrence probability) storm event was used in the design of the roadside ditches and storm sewer systems.   Cross culverts and receiving channels were sized to convey the 50-year (2% occurrence probability) storm event while passing the 100-year storm event without overtopping the roadway.   The drainage analysis included a watershed sheet flow analysis that resulted in the recommendation that 28 "pass-through" culverts be included in the project design.   These pass-through culverts will aid in the passage of sheet flow where it currently flows freely across the roadway corridor.

The final hydraulic design of the roadway will be done during the design phase using the most recent floodplain data that is available for use, including the data presented in the Cypress Creek PMR.[7]   The final hydraulic design will be done in accordance with the applicable federal, state, and local policies. Policy III, in Section 1.3.3 of the District's Policy Criteria and Procedure Manual, October 2004, Doc. No. 723, AR 025757-AR 025785, states that "projects by others shall avoid increasing flood risks or flood hazards or creating new flood hazard areas."   Section 6.1.1, Doc. No. 723, AR 025873, of the manual states that infrastructure improvements with detention requirements are to be designed such that "flood levels downstream of the project do not increase."

---

[7]*See* n. 4, *supra*, discussion of TxDOT Project Development Process, *see also* App. B.

Adherence to this policy dictates that the project will have a "no net rise" effect on the flood levels along the watercourses traversed by the project.

Floodplain data is ever-changing. This is why it is necessary to use the effective data (data approved by FEMA), along with any newer data that is the best available at the time a decision is made (as was done here by the use of the approved FIRM and the use of the Flood Hazard Recovery Data for Cypress Creek that was approved in 2007). Doc. No. 691, AR 023518, Doc. No. 703, AR 023784. To this day, the Physical Map Revision for Cypress Creek remains pending with FEMA,[8] thus the best data available is to be used until the PMR is approved. Federal agencies often grapple with this phenomenon of ever-changing data, and they are not required to withhold decisions until perfect data is available.[9] If they were required to do so, they could never perform their decision-making duties in a timely manner.

The June, 9, 2009 Revised ROD concludes that the June 24, 2008 ROD remains valid, and that the Selected Alternative was the only practicable alternative. Doc. No. 706, AR 024864. This is because the floodplain boundaries of the watercourses traverse the entire study area, and because the Selected Alternative minimizes the floodplain encroachment, and this scenario remains the same, even in light of the new information. Doc. No. 706, AR 024860-AR 024864. In other words, even if the PMR data were available at the time of the June 24, 2009 ROD, FHWA would have reached the same conclusion. Punske Aff. ¶ 15, Exh. A.

---

[8] *See* n.5, *supra.*

[9] *See generally Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 202 F. Supp. 2d 594, 632 (W.D. Tex. 2002) (citing *Nat'l Wildlife Fed'n v. Babbitt* , 128 F. Supp. 2d 1274, 1286 (E.D. Cal. 2000) (where available data is imperfect, Service is not obligated to supplement it or defer issuance of biological opinion until better information is available; Service must use best scientific and commercial data available regardless of sufficiency of that data); *see also City of Shoreacres v. Waterworth*, 332 F. Supp. 2d 992, 1019 (S.D. Tex. 2004) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 412, 96 S. Ct. 2718 (1976) (resolution of issues requiring a high level of technical expertise is properly left to the informed discretion of the responsible federal agencies)).

### 3.    Defendants thoroughly analyzed potential direct and indirect impacts on floodplains.

Plaintiff states that neither the FEIS nor the Drainage Analysis addresses induced growth impacts from induced growth caused by the proposed Segment E.  Pl.'s Corr. Mot. Summ. J. 25. Specifically, Plaintiff argues that Segment E will destroy more floodplains and wetlands than acknowledged in the FEIS because the FEMA map relied on in the FEIS underestimates the amount of floodplains in the project area.   This assertion is simply false.  As discussed in the FEIS, the project will be designed to include bridges placed to span watercourse floodways to minimize impacts to the maximum extent feasible and practicable.[10]  Doc. 624, AR 018521, Doc. 703, AR 023794.  Where impacts cannot be avoided, they will be mitigated.  Doc. 706, AR 018557, AR 018566-AR 018567.  Mitigation may be proposed, as was done here, in the environmental document. 43 TEX. ADMIN. CODE  § 2.16(a).  App. F.  Final selection of mitigation measures, however, generally does not occur until the final design phase (also known as Plans, Specifications and Estimates ("PS&E")), with completion of mitigation measures occurring during the construction phase.[11]  TxDOT must, and will, ensure that committed mitigation measures are completed as listed in approved environmental documents.  23 C.F.R. § 771.109(b) and (d).  App. I.

The impacts of the proposed project on hydrology, drainage, floodplains, and floodways were analyzed using the guidelines and criteria set forth in the Texas Department of Transportation Hydraulic Design Manual, dated March 2004, as referenced in the Segment E June 2009 Drainage

---

[10]Plaintiff admits that bridges will span all of the regulatory floodways crossed by Segment E, but complains that the decision not to bridge the entire floodplain constitutes an inadequate alternatives analysis. Pl's Corr. Mot. Summ. J. 18.  The decision-making agency is not required to look at every alternative; rather it must consider reasonable alternatives.  *North Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147 (9th Cir. 2008).  The Plaintiff's preference is not sufficient to overcome Defendants' reasonable decision to bridge the regulatory floodways.

[11]*See* note 4, *supra*.

Impact Study, Doc. No. 703, AR 023782, AR 023783, AR 023785-AR 023786, Re-Evaluation of the FEIS for Segment E, Doc. No. 702, AR 023739, and Revised ROD for Segment E, Doc. No. 706, AR 024863. Hydrology was analyzed using the Rational Method for runoff areas less than 200 acres and the Texas Regression Equation for areas greater than 200 acres. Hydrologic modeling was done for both the existing and proposed condition. Design models for drainage within the limits of the project right-of-way were performed using the WinStorm program. A 10-year (10% occurrence probability) storm event was used in the design of the roadside ditches and storm sewer systems. Cross culverts and receiving channels were sized to convey the 50-year (2%) storm event while passing the 100-year (1%) storm event without overtopping the roadway. The drainage analysis included a watershed sheet flow analysis that resulted in the recommendation that 28 "pass-through" culverts be included in the project design. These pass-through culverts will aid in the passage of sheet flow where it currently flows freely across the proposed roadway corridor.

The proposed project will be designed and constructed in accordance with all applicable federal, state and local design criteria. Policy III, in Section 1.3.3 of the Harris County Flood Control District Policy Criteria and Procedure Manual, October, 2004 Doc. No. 723, AR 025757-AR 025785, states that "projects by others shall avoid increasing flood risks or flood hazards or creating new flood hazard areas." Section 6.1.1, Doc. No. 723, AR 025873, states that infrastructure improvements are to be designed such that "flood levels downstream of the project do not increase." Adherence to this policy dictates that the project will not cause any downstream impacts to the flood levels along the watercourses traversed by the project. The proposed project will be designed such that the current effective floodway for each watercourse the project crosses will be spanned by a bridge. This will avoid or minimize impacts to the maximum extent feasible and practicable on the defined floodways of the watercourses due to bridge encroachment.

**4.      Plaintiff's assertions about Defendants' consultants are mere speculation and designed to confuse the issues.**

Plaintiff makes several speculative statements about Robb Fishman, Burton Johnson, and Brown & Gay Engineers.  These baseless allegations should be ignored by the Court as they are easily explained, but more importantly, they have no bearing on whether Defendants used the best available floodplain data.  The Administrative Record makes clear that Defendants used the best data available when analyzing floodplains.  *See* Doc. No. 691, AR 023512-AR 023518, Doc. No. 703, AR 023784, Doc. No. 706, AR 24860, AR 024791, AR 024997-AR 025000.  "[W]hether the administrator was arbitrary must be determined on the basis of what he had before him when he acted, and not on the basis of 'some new record made initially in the reviewing court.'"  *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984) (quoting *Camp v. Pitts*, 411 U.S. at 142).

In its motion, Plaintiff refers to an "obfuscatory and misleading" email sent by Robb Fishman regarding the floodplain data.  Pl.'s Corr. Mot. Summ. J. 22.  A dispassionate reading of the email request by Mr. Fishman simply shows that he was not aware of the specifics of the upcoming changes to the FEMA maps, he was aware only that FEMA and Harris County had recently completed a county-wide update and re-study of Harris County flooding sources.  Doc. No. 670, AR 023372.  And in any case, even if Mr. Fishman and Brown & Gay knew the information was inaccurate, the fact remains that the best available floodplain data was used at all times in the development of the Segment E environmental documents.  *See* Punske Aff. ¶¶ 6-9, ¶¶ 11-12, ¶ 14, Exh. A; Doc. 691, AR 023512-023518, Doc. No. 703, AR 023784, Doc. No. 706, AR 024860, AR 024971, AR 024997-AR 025000.  The spurious contentions about Burton Johnson having "delayed his response" two months are similarly dismissed.

13

Plaintiff's assertion that the FEIS relied on a 2007 drainage study from Brown & Gay incorporating new floodplain data is erroneous.  The page to which Plaintiff points, Doc. No. 624, AR 018516, does not reference the Brown & Gay study.  Rather, Doc. No. 624, AR 018516 clearly references the Tropical Storm Allison Recovery Project's ("TSARP") Preliminary Digital Flood Insurance Rate Maps (DFIRMs) that were finalized in December 2006 and became effective as of June 18, 2007 (*see* Doc. No. 730, AR 026437, Doc. No. 624, AR 018678 (FEIS References Cited)).  The Brown & Gay drainage studies were used in the EIS process as well as the latest Preliminary DFIRM maps, as the Preliminary DFIRM maps were considered the most current, approved mapping at the time.  The floodplain analysis was updated in the Segment E Re-Evaluation and Revised ROD when more current floodplain mapping/analysis was approved and available.  Doc. No. 702, AR 023736-AR 023737, Doc. No. 706, AR 024860-AR 024864, AR 024997-AR 024999.

As to the claim that the "so-called 2007 drainage study" is the 2003 Brown & Gay drainage study with a 2007 cover, Doc. No. 603, AR 015764-AR 015766, this document was intended only as a compilation of the drainage impact studies on file as of May 2007 to document the initial findings of the drainage analysis – not to serve as an updated May 2007 drainage study.  Document 603 includes the February 2003 and December 2005 drainage analyses.  It appears that Brown & Gay inadvertently placed a December 2004 document on the February 2003 document.  The December 2004 document has been requested and obtained from Brown & Gay.  The complete February 2003 document with the February 2003 cover is already contained in the Administrative Record.  Doc. No. 412, AR 009924-AR 010024.  Note that the most current June 2009 Brown & Gay drainage study was used for the development of the Re-Evaluation and Revised ROD.  Doc. No. 703, AR 023774-AR 024849.

Despite Plaintiff's numerous conspiracy theories, the fact remains that there was no willful failure to use accurate scientific information.  On the contrary, Defendants relied on the best available floodplain data at all times.  *See* Punske Aff. ¶¶ 6-9, ¶¶ 11-12, ¶ 14, Exh. A; Doc. 691, AR 023512-AR 023518; Doc. No. 703, AR 023784; Doc. No. 706, 024860, AR 024971, AR 024997-AR 025000.

> **D.      Based upon the clear and justified statement of the Project's Purpose and Need a reasonable range of alternatives was analyzed.**

Plaintiff's brief leaves little unchallenged on the issue of the project's defined purpose and need and alternatives analysis.  Not only does Plaintiff assert that the statement and analysis were insufficient, and conducted in bad faith, Plaintiff also claims that the most basic FHWA NEPA guidance on purpose and need serves to coach transportation agencies on how to "manipulate" the process.  *See* Pl.'s Corr. Mot. Summ. J. 6.  This challenge to the guidance materials appears to be unique in FHWA's NEPA litigation experience.  Defendants' response will necessarily address this allegation as to the guidance.  It will also show that the purpose and needs identified in the DEIS and FEIS are valid and that the range of alternatives studied during the process meets all NEPA requirements.

> **1.      The Guidance issued by FHWA serves to assure compliance with the NEPA requirements.**

Obviously, all of FHWA guidance materials cited herein, and used in the NEPA process for Segment E, are based on the Council on Environmental Quality ("CEQ") NEPA regulations.  40 C.F.R. §§ 1500-1508, App. C.  FHWA's NEPA regulations also serve as guidance to transportation agencies in the NEPA process.  *See* 23 CFR §§ 771.101-771.139.  App. I.  Of particular importance in the regulations is FHWA's *Environmental Impact and Related Procedures Policy* at 23 CFR § 771.105.  App. I.  This section can be summarized as follows, requiring that:

15

- To the fullest extent possible, all environmental investigations, reviews, and consultations be coordinated as a single process, and compliance with all applicable environmental requirements be reflected in the environmental document required by this regulation.

- Alternative courses of action be evaluated and decisions be made in the best overall public interest based upon a balanced consideration of the need for safe and efficient transportation; of the social, economic, and environmental impacts of the proposed transportation improvement; and of national, state, and local environmental protection goals.

- Public involvement and a systematic interdisciplinary approach be essential parts of the development process for proposed actions.

- Measures necessary to mitigate adverse impacts be incorporated into the action.

The CEQ regulations implementing NEPA state that an EIS "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. This is NEPA's only requirement for the purpose and need. With this bare requirement, agencies were compelled to issue their own particular guidance on how to meet this requirement. Plaintiff now claims that one of those guidance documents—*Purpose and Need in Environmental Documents* (1990)—essentially coaches transportation agencies on how to avoid NEPA requirements and to rig the process. *See* Doc. No. 719, AR 025211-025216 (1990 P&N Memo), App. K. This argument can only be described as absurd.

Prior to the 1990 P&N Memo, App. K, FHWA had already begun issuing guidance on complying with CEQ's NEPA requirements, including those on purpose and need ("P&N") and alternatives. *See* FHWA Technical Advisory T 6640.8A, *Guidance Material for the Preparation of Environmental and Section 4(f) Documents* (October 30, 1987)(replacing original NEPA guidance issued in 1982). *See* Doc. No. 14, AR 000359-000426, and App. H). In fact, this 1987 NEPA

16

guidance was specifically listed as being used in the preparation of the Segment E FEIS. Doc. No. 624, AR 017922.  Other documents specifically referenced in the FEIS include FHWA's joint memorandum issued with the Federal Transit Authority ("FTA") entitled *Integration of Planning and NEPA Processes* (2005), App. J, and TxDOT's *Guidance on Purpose and Need* (2001)  *Id.* App. L.  Finally, other relevant guidance that would have been used or relied upon by FHWA and its staff, in approving the FEIS and issuing the ROD, include the FHWA FTA Joint *Guidance on Purpose and Need* (2003)(issued based on CEQ Chairman James Connaughton's letter of May 12, 2003, dealing purpose and need). (App. M).  *See*, Affidavit of Michael Leary ("Leary Aff."), ¶7 (Exh. B).

All FHWA guidance is issued, including FHWA's 1990 P&N Memo, with the intent to ensure its consistency and compliance with NEPA.  App. K, Leary Aff., ¶8, Exh. B.  The 1990 P&N Memo, App. K, plainly states that the guidance "provides detailed information on: the importance of purpose and need; how it drives the range of alternatives that must be considered, its basic elements; and how it can be used in decision-making."  *See* Doc No. 719, AR 025212.  The Memo goes on to describe the possible outcomes of a vague purpose and need related to compliance of the CEQ regulations requirement "of evaluating all, or a reasonable number representative of the full spectrum of reasonable alternatives."  Doc. No. 719, AR 025213.

The 1990 P&N Memo, App. K, does provide some coaching in the sense that it provides guidance on how to comply with NEPA in preparing a project's P&N and the analysis of alternatives.  A fair reading of the guidance document shows that it does not, in any way, endorse or describe methods to avoid or shelter noncompliance with NEPA requirements.  *See* Leary Aff. ¶9, Exh. B.  The assertion that the 1990 P&N Memo, App. K, directs applicants to purposely narrow the purpose and need to limit the study to a single alternative is again, at best, absurd.

17

The 1990 P&N Memo, App. K, and the other related guidance and regulations mentioned above, have served FHWA and its applicants well for many years.  FHWA readily admits that it relied upon this guidance, and the others cited in the FEIS.  *See* Leary Aff. ¶7, 8, Exh. B.  Thus, should the court find that FHWA's NEPA guidance is, in itself, deficient, then obviously this project's documentation fails to meet the requirements of NEPA— as does all other FHWA NEPA project documentation and decisions issued since at least 1990.  Of course, the converse should also be true. If the FHWA P&N guidance is in compliance with NEPA, and Defendants followed it, as Plaintiff asserts, then the decisions reached should be found to comply with NEPA. Thus, the more critical and germane question is did the Defendants' NEPA process on Segment E follow the regulations and guidance?  Defendants maintain that the process did so.

## 2. The Purpose and Needs identified in the NEPA documents permitted a full exploration of reasonable alternatives.

The responsibility for defining the P&N in a NEPA document for a proposed action lies with the agency conducting the environmental analysis.  *Alliance for Legal Action v. Fed. Aviation Admin.,* 69 Fed. App'x 617, 622 (4th Cir. 2003) ("[t]he statement of a project's purpose and need is left to the agency's expertise and discretion"); *Route 9 Opposition Legal Fund v. Mineta,* 213 F. Supp. 2d 637, 643 (N.D. W. Va. 2002); *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 195-96 (D.C. Cir. 1991).  Courts have afforded agencies considerable discretion to define the purpose and need of a project.  *Alliance for Legal Action,* 69 Fed. App'x at 622 ("we defer to the agency if the statement is reasonable"); *Citizens Against Burlington,* 938 F.2d at 195 ("We uphold an agency's definition of objectives so long as the objectives that the agency chooses are reasonable"); *City of Alexandria v. Slater,* 198 F.3d 862, 867 (D.C. Cir. 1999) (courts evaluate

18

whether an agency's objectives are reasonable "with considerable deference to the agency's expertise and policy-making role").

Plaintiff argues that the P&N presented are not legitimate and were simply *post hoc* justifications. Support for this proposition stems from Dr. Handy's views as expressed in her expert affidavit. *See* Pl.'s Corr. Mot. Summ. J. 7-10. It appears, from Plaintiff's Motion and exhibits, that Plaintiff is attempting to supplement the record for the sole purpose of engaging in a "battle of experts" with the agency on this topic. But, again, NEPA was not intended to be an expert battleground. *Marsh v. Oregon Nat. Res. Council,* 490 U.S. 360, 378, 109 S. Ct. 1851, 1861 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views persuasive"); *Sierra Club v. Froehlke,* 816 F.2d 205, 214 (5th Cir. 1987) (scientific disagreements among experts "are not the type that the federal courts are in business to resolve").

The arguments advanced through Dr. Handy's expert report and affidavit do show one thing quite clearly: Plaintiff has a different definition of transportation terms and goals, and a differing view of the region's transportation needs than that of the respective local, state and Federal agencies. Under NEPA, however, as explained above, the setting of transportation statement objectives in the P&N is left to the respective agency's expertise and discretion. *See, e.g. Alliance for Legal Action,* 69 Fed. App'x at 622, and "[t]he Court must uphold an agency's definition of objectives so long as the objectives that the agency chooses are reasonable." *Davis v. Latschar,* 202 F.3d 359, 368 (D.C. Cir. 2000); *see Clairton Sportsmen's Club v. Pa. Turnpike Comm'n,* 882 F. Supp. 455, 477 (W.D. Pa. 1995) ("We have no power to choose the Agencies' transportation goals"). Indeed, FHWA is entitled to "focus primarily on transportation and safety issues" in its P&N for a highway project. *City of Alexandria v. Slater,* 198 F.3d at 868.

19

The FEIS elements of P&N for Segment E are set out here again for easy reference:

NEEDS: Transportation improvements are needed in the Segment E study area because there are inefficient connections between suburban communities and major radial roadways, the current and future transportation demand exceeds capacity, many roadways in the study area have a high accident rate, and there is an increasing strain on transportation infrastructure from population and economic growth.

Doc. No. 624, AR 017858.

PURPOSE (GOALS): The purpose of the proposed transportation improvements in the Segment E study area is to efficiently link the suburban communities and major roadways, enhance mobility and safety, and respond to economic growth. The goal is to improve system linkage, address current and future transportation demand, improve safety, and address population and economic growth.

Doc. No. 624, AR 017859.

Dr. Handy's report quibbles with the P&N statements and suggests that they use "narrow definitions." Pl.'s Corr. Mot. Summ. J. 9. She seeks to define how FHWA should define and use the terms "capacity" or "congestion." She also asserts that the terms employed somehow allowed FHWA to simply reach a foregone conclusion that the road was needed. From these statements it appears that Dr. Handy could have a basic misunderstanding of the transportation planning process.

P&N statements, and alternatives, for transportation purposes are initially shaped by the actions and planning conducted by Metropolitan Planning Organizations ("MPOs"), and State departments of transportation, transit and airport authorities. In the Houston area the local MPO is the Houston-Galveston Area Council ("H-GAC"). For 40 years, Congress has directed that Federally-funded highway and transit projects must flow from metropolitan and statewide transportation planning processes. 23 U.S.C. §§ 134-135 and 49 U.S.C. §§ 5303-5306. Over the years, Congress has refined and strengthened the planning process as the foundation for project decisions, emphasizing public involvement, consideration of environment and other factors, and a Federal role that oversees the transportation planning process but does not second-guess the content

20

of transportation plans and programs. *See, e.g.*, *Atlanta Coal. on the Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1338-40 (5th Cir. 1979).

As for the Grand Parkway, and specifically Segment E, neither FHWA nor TxDOT initiated this project.  The Grand Parkway arises out of local planning process.  It was H-GAC that found congestion, and other transportation issues and problems, exist in the area of Segment E. It was the H-GAC, through the local planning process, who put forward the initial P&N for this project.  *See, e.g.*, Doc. No. 89, AR 002700, Doc. No. 514, AR011713, AR012048, AR012054.[11]  Given the planning process and the evaluation conducted through the DEIS and FEIS, the Defendants' P&N statement and the goals and objectives underlying the proposed segment of the Grand Parkway are reasonable and should be afforded deference.[12]

---

[11] Given again that NEPA is not a "battle of the experts" perhaps this brief should not quibble with Dr. Handy too much but here is one of what would be many quibbles in a regular expert testimony driven lawsuit. Plaintiff, based on Dr. Handy's work, asserts that there is no "special safety need for segment E."  *See* Pl.'s Corr. Mot. Summ. J. 10. Plaintiff further claims that it is an "ecological fallacy" to have the FEIS maintain that a divided, limited access facility is safer than say a non-divided, unrestricted access highway facility. Pl.'s Corr. Mot. Summ. J. 14-15.  The DEIS and FEIS addresses the safety benefits of a limited access highway based on recognized sources. *See, e.g.*, Doc. No.  411,  AR 009043, AR 009103-AR 009104, Doc. No. 624, AR 017934-AR 017935, AR 018322-AR 018324, AR 018349. The H-GAC also spends a great deal of time writing on and analyzing transportation safety issues for the region.  *See, e.g.*, Doc. No. 401, AR 008904-AR 008907, Doc. No. 514, AR 012380-AR 012418. The studies cited in these documents make it abundantly clear that the assertion that a limited access highway is generally "safer" than an unrestricted access local road is indeed correct.  See the studies, such as those by Cirillo et al. 1968 and McGuirk 1973, referenced in the DEIS and FEIS. (Doc. 624, AR 018663, AR 018670).

[12] Plaintiff and Dr. Handy spend a great deal of time referring to statements made at a meeting involving the Texas Transportation Commission.  They seek to use a transcript of this meeting to show that the real purpose behind the Grand Parkway is different from what the DEIS/FEIS and ROD show. This statement is then equated to be a showing of bad faith in the NEPA process. *See* Pl.'s Corr. Mot. Summ. J. 5-6.  Suffice to say that one official's statements, in March of 2009 after issuance of the original ROD, and who was not involved in the NEPA process and certainly was not a final decision-maker (here that is FHWA), mean very little.

3.      **The Alternatives Analysis conducted in the DEIS and FEIS is both reasonable and sufficient under NEPA requirements.**

Plaintiff next asserts that the conclusions in the FEIS are contrary to the data and findings contained in the document.  *See* Pl.'s Corr. Mot. Summ. J. 11-13.  The argument from Plaintiff in this section focuses on the data supporting the need for the project such as traffic data, accident rates, and induced growth.  Plaintiff claims the data is insufficient to justify the project.  However, the FEIS, ROD and the Record all show that the conclusions are supported and fully in compliance with an agency's obligations under NEPA.  This section of the Defendants' response will not attempt to respond to each and every small point in Dr. Handy's report but will look to the major issues raised in Plaintiff's Motion.

The Motion and Dr. Handy spend a great deal of time and effort to suggest that no major congestion problem exists in the area to be served by Segment E and that the data shows no relief would be achieved by the project's construction.  But, as even Plaintiff's Motion notes, the data does show that the project will provide some easing of traffic.  Doc. No. 624, AR 018313; Pl.'s Corr. Mot. Summ. J. 11.

The need for the relief of traffic congestion in this area, secured with the proposed construction of the Segment E project, is recognized by the local transportation agency. In accordance with the plan adopted by the H-GAC in its Congestion Management System ("CMS"), "[r]egionally significant added-capacity roadway projects are justified only if cost-effective demand management and system management strategies fail to reduce vehicular congestion to acceptable levels."  Doc. No. 99, AR 002874.  The H-GAC reviewed the Congestion Mitigation Analysis ("CMA") for Grand Parkway Segments E, F-1, F-2 and G and determined the Level of Mobility ("LOM") "will sufficiently deteriorate to justify and consider adding capacity to the corridor.  The study further suggests that although the indicated Transportation Control Measures ("TCMs") within

22

the analysis area have a degree of impact on Congestion Mitigation, this effect is not enough to impend the added capacity justification." Doc No. AR 018869-AR 018870. Under the H-GAC CMS, which is necessarily prepared in accordance with 23 CFR § 450.320, Congestion Management Process, the local agency is of the opinion that the added capacity of Grand Parkway Segment E is warranted. Leary Aff. ¶10, Exh. B.

Next Plaintiff attempts to argue that the road is not needed as the area already has a "low accident rate." Pl.'s Corr. Mot. Summ. J. 13-14. The analysis in the FEIS, as noted in Dr. Handy's report, shows that Average Daily Traffic ("ADT") on all of the roadways in the area will see an expected decrease in traffic through 2015. Doc No. 624, AR 018348 (Table 2-6). The FEIS does not provide an analysis of the expected crash rate reduction, only the note that reduced ADT will generally result in reduced accident numbers. But even if the accident rate is only somewhat improved and traffic congestion only somewhat lessened the decision reached in the ROD is confirmed. But again the query here is not whether FHWA reached the right decision or whether its decision on the project is justified in the eyes of the Plaintiff and the court. This court is, as are all courts in NEPA matters, limited in its review and only should look to see if the process follows the requirements laid out under NEPA. In one recent case, *Senville v. Peters*, 327 F. Supp. 2d 335, 355 (D. Vt. 2004), the proposed construction of a new roadway was challenged by Plaintiff on the basis that the currently proposed segments on a roadway project did not possess a significant purpose and that the road was improperly segmented. In dealing with the question as to whether the roadway segments had independent utility the court noted:

> The Defendants acknowledge that the quantitative improvement for the individual driver from the construction of Segments A-B is a slim seven seconds of time saved per vehicle during the evening rush hour. (AR 30004252.) And congested VMT (vehicle miles traveled) is projected to decrease by a modest 2%, mostly on local streets and arterials. (AR 30004258.) The Defendants are quick to point out,

however, that those seven seconds, when multiplied by the estimated number of vehicles, results in savings of approximately 467,700 seconds.  (AR 30004252.) Whether achieving a savings of seven seconds in commuter time represents a wise expenditure of resources is not a judgment that this Court is permitted to make.

*Id.*

Although Dr. Handy's report seems to question the FEIS conclusions on almost everything, she still cannot conclusively assert that there will not be some congestion relief or fewer traffic accidents.  For example, while she disputes the FEIS claim of lower crash rates for limited access facilities and asserts that this is an "ecological fallacy," it appears even her report admits the possibility that accident rates would be lesser on the Parkway.  Dr. Handy's Report, p. 4. Thus, with any amount of relief in the area's traffic congestion or any reduction in accidents, the process resulting in the ROD is shown to be valid and the P&N and alternatives set out in the FEIS as meeting the process requirements of NEPA.

Plaintiff also contests the evaluation and study on induced growth in the project area.  The Plaintiff, again through its expert Dr. Handy, particularly calls out the use of an expert panel that was used to look at this issue.  In fact, the Motion states that Dr. Handy believes such panels are "not an accepted practice within the transportation planning profession" especially where "more sophisticated modeling practices are available."  Pl.'s Corr. Mot. Summ. J. 16.  Yet again it appears that Dr. Handy may not be aware of all the current thinking in NEPA documentation practices.

Numerous expert bodies and groups recognize that expert panels are well-recognized and even recommended.  One of the most prestigious bodies in this area is the Transportation Research Board of the National Research Council.  In its published report, the *Desk Reference for Estimating the Indirect Effect of Proposed Transportation Project*: *National Cooperative Highway Research Report (NCHRP) 466* (2002), referenced in the FEIS, it recognizes that a thorough survey by local experts, stakeholders, and professionals, in other words an expert panel, can be invaluable in

developing assumptions and assessing future conditions. Doc. No. 350, AR 008264. The noted survey techniques include informal conversations; formal inquiry following an instrument administered by mail, phone or interview; or discussions or meetings of a collaborative task force panel. *Id.,* AR 008342. Further, "[e]xpert panels or detail interviews with local real estate, government, and industry leaders may be a workable substitute for the Delphi method when panelist would be unable to participate in the iterative process." *Id.,* AR 008343.

The expert panel for examining the area of the Grand Parkway was made up of 28 individuals, including 2 developers; 2 consultants; 3 school district representatives; 8 Harris and Montgomery county planning and engineering department representatives; 1 representative of Harris County Flood Control District; 2 higher learning institution representatives; 2 City of Houston Planning and Development department representatives; and 5 representatives of the regional transportation planning organization, Houston-Galveston Area Council (H-GAC). Doc. No. 537, AR 014341-AR 014342. All panel members were from the Houston area and were knowledgeable of the area. Their work resulted in the preparation of *Working Paper 2: Land Use Development Analysis - "Cumulative and Indirect Effects." See* Doc. No. 537, AR 014324-AR 014405. The workings of the panel appear throughout the Record. *See, e.g.*, Doc. No. 181, AR 006207-AR 006249; Doc. No. 183, AR 006262-AR 006309; Doc. No. 200, AR 006717-AR 006729; Doc. No. 208, AR 006786-AR 006793; Doc. No. 217, AR 006900-AR 006911; Doc. No. 225, AR 006948-AR 006958; and, Doc. No. 232, AR 006992-AR 007008. The use of an expert panel here, and the specific members of the panel being well-qualified, was a part of a well-recognized and acceptable professional practice. *See* Leary Aff. ¶11, Exh. B.

The data, information, materials and NEPA process conducted through TxDOT and its consultants and overseen by FHWA was not a "skewed" process. The documents produced and

25

analysis within those documents may not reach the result sought by the Plaintiff.  But they do reflect that a hard look was taken in a process that complies with the requirements in NEPA.

> **4.      Defendants considered a full range of reasonable alternatives.**

Plaintiff also argues that Defendants failed to consider reasonable alternatives including a bridging of all the area wetlands and a combination of various other alternatives.  Defendants assert that a range of reasonable alternatives was studied and discussed in the FEIS. This issue was previously discussed in the Federal Defendants' Motion for Summary Judgment as well as the State Defendants' Motion.  *See* Dkt. Nos. 46 and 49.  In addition to that the materials and arguments advanced there, the Defendants add the following response.

First, the range of alternatives to be analyzed is determined by the project's statement of purpose and need.  *See Citizens Against Burlington,* 938 F.2d at 195 ("The goals of an action delimit the universe of the action's reasonable alternatives").  With a valid and legally cognizable P&N, the appropriate range of alternatives to be examined and considered is within the agency's discretion. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215 (1978).  Federal agencies are not obligated to give detailed consideration to every possible alternative proposed.  *Id.* at 551-52 (a "detailed statement of alternatives cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man."); *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.,* 123 F.3d 1142, 1155 (1997) (the EIS "need not consider an infinite range of alternatives, only reasonable or feasible ones").  An "alternative is reasonable only if it will bring about the ends of the federal action."  *Citizens Against Burlington,* 938 F.2d at 194-95; *see City of Alexandria,* 198 F.3d at 869 (a "'reasonable alternative' is defined by reference to a project's objectives").  Finally, it should be

noted that "there is no minimum number of alternatives that must be discussed." *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994).

Admittedly, the FEIS did not consider Plaintiff's proposed alternative, which would require a bridge to be built over the entire length of the floodplain and wetlands areas.  Defendants are also sure there are a myriad of other possible highway alternatives that were not studied, such as tunnels in certain sections.  However, the process, as reflected in the Record, shows that the DEIS and FEIS considered a range of "reasonable" alternatives.  *See* Doc. No. 624, AR 017938-AR 017969 (Vol. 1 of FEIS) and AR 018325-AR 018358 (Vol. 2 of FEIS).[13]

Plaintiff also claims that the FEIS is deficient as it failed to study a "combination of alternatives" to see if they could meet the project's P&N.  "When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." *City of Angoon v. Hodel,* 803 F.2d 1016, 1021 (9th Cir. 1986).  Moreover, the government need not consider alternatives that offer only modified efficiency.  *Young v. Gen. Servs. Admin.,* 99 F. Supp. 2d 59, 69 (D. D.C. 2000).  FHWA here did look to verify that any considered alternative met the project's P&N.  Leary Aff. ¶12, Exh. B.

Plaintiff cites only one case for the proposition that NEPA requires FHWA to analyze and consider a combination of various alternatives to address the project's P&N: *Davis v. Mineta*, 302 F.3d 1104, 1120-1122 (10th Cir. 2002).  However, the facts and the basis for the holding in *Davis* shows that it is inapplicable to this litigation.

---

[13] Defendants here specifically refer the court to both of their earlier filed Motions for Summary Judgment. These Motions for Summary Judgment, of both the Federal and State Defendants, are specifically incorporated by reference into this response.

In *Davis* the court was dealing with an environmental assessment ("EA") on a project that sought to expand an existing roadway and to build a new bridge crossing over the Jordan River in Salt Lake City. The area of the project where the crossing was to be built involved the necessary taking of parkland protected under Section 4(f). 23 U.S.C. § 138. Plaintiff proposed that instead of considering only expanding the one roadway and constructing the new crossing over the 4(f) resources, that other individual highways already crossing the Jordan River be considered for expansion. The court specifically noted:

> Alternatives need not be studied if they are "remote, speculative ... impractical or ineffective." *Airport Neighbors Alliance, Inc.,* 90 F.3d at 432 (quotation omitted). However, **particularly in light of § 4(f)'s stringent mandates**, we have seen nothing in the record to justify the failure of the EA to study the alternatives, separately or in combination, of expanded capacity over the Jordan River at 12300 South and 10600 South and a new crossing at 9800 South.

*Davis*, 302 F.3d at 1121(emphasis added).

As has been found in the documentation here, there are no Section 4(f) properties involved in this project. *See* Doc. No. 624, AR 018443. Additionally, the facts in *Davis* are completely dissimilar to those here. The Utah project was deciding whether to expand roadway and crossings without 4(f) impacts or to build a new crossing with 4(f) resources being taken. Finally, Plaintiff essentially argues how dare FHWA look to one alternative to meet the project's P&N. Pl.'s Corr. Mot. Summ. J. 18-19. In response the Defendants can only note that "it is simply a non sequitur to call a proposal that does not 'offer a complete solution to the problem' a 'reasonable alternative.'" *City of Alexandria,* 198 F.3d at 869.

**E.    The Wetlands analysis fully complies with NEPA requirements.**

Plaintiff asserts that Defendants violated NEPA in their discussion of wetlands impacts by failing to a) evaluate the full extent of the wetlands that will be impacted by Segment E, b) account

for induced growth, c) consider a wetlands-spanning bridge alternative, and d) sufficiently discuss mitigation measures.  Specifically, Plaintiff claims that Defendants' discussion of Segment E's potential impacts on wetlands and the available measures to mitigate those impacts overall lacks "sufficient detail" to comply with NEPA.  Pl.'s Corr. Mot. Summ. J. 27.  This argument not only ignores sufficient evidence to the contrary in the Administrative Record, but also neglects to consider the highway project development process.   As is customary, many decisions concerning environmental impacts of highway projects are made after the NEPA process, during the design and construction phases when the extent of a project's impact is more clear.  Punske Aff. ¶ 18, Exh. A.  This holds especially true for the mitigation of impacts to wetlands.   Nevertheless, the Administrative Record clearly demonstrates that Defendants took the requisite "hard look" at wetlands.

Plaintiff argues that Defendants completely failed to evaluate all of the wetlands that will be impacted by Segment E, basing the argument on a Conceptual Mitigation Plan submitted to USACE projecting 45.63 acres of impacted wetlands, as opposed to the previously reported 15.13 acres.  Pl.'s Corr. Mot. Summ. J. 27.  Plaintiff's reliance on the Conceptual Mitigation Plan as evidence of insufficient detail is improper because the Plan is not part of the Administrative Record.  It has been well stated in the pleadings that the court's review of agency decisions in the NEPA context is limited to the information contained in the Administrative Record, that is, the information in front of the agency when it decided on a course of action.  *Fla. Power & Light Co. v. Lorian*, 470 U.S. 729, 743, 105 S. Ct. 1598, 1607 (1985).  As already stated,*supra* note 4,  the Conceptual Mitigation Plan was not in front of Defendants when the NEPA decision was made because the Plan was completed for the Section 404 permit process, after the ROD was signed.  The Section 404 permitting process before the U.S. Army Corps of Engineers is separate and apart from the NEPA

review, occurring during the project's design phase.  Punske Aff. ¶ 18, Exh. A.

That being said, with regard to wetlands identification conducted in the FEIS, Defendants relied on results from several different sources of highly technical investigation, including infrared aerial photographs,[14] a helicopter survey of proposed alignment alternatives, and a ground survey. AR 018492–018494.  In addition, Defendants conducted a formal wetlands delineation[15] in accordance with the USACE Wetlands Delineation Manual.  AR 018493.  Because such technical decision-making is entitled to substantial deference by federal courts, Defendants complied with NEPA in relying on the delineation.  *City of Shoreacres v. Waterworth*, 332 F. Supp. 2d 992, 1018-19 (S.D. Tex. 2004) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 412, 96 S. Ct. 2718 (1976) (finding that the resolution of issues requiring a high level of technical expertise is properly left to the informed discretion of the responsible federal agencies)).  In addition, there will be no expansion of the areas delineated as wetlands due to the floodplain expansion, because floodplain boundaries did not factor into the wetlands delineation process.  Doc. No. 494, AR 011221-AR 011501; Doc. No. 533, AR 014261-AR 014311; Punske Aff. ¶ 16, Exh. A.

Plaintiff accuses Defendants of failing to account for impacts to wetlands that will result from induced growth attributable to Segment E.  Pl.'s Corr. Mot. Summ. J. 28.  This accusation is false. The FEIS identifies, based on guidance from the Expert Panel, the amount of wetlands acreage that would be indirectly impacted by Segment E, as well as other Grand Parkway Segments.  AR 018038; (Punske Aff. ¶ 17, Exh. A).  In addition, Defendants recognize that future development within the Segment E project area could result in wetlands sediment loading, AR 018576, but that no indirect

---

[14]One such aerial map, identifying all wetlands within the Segment E project area, is reproduced as Exhibit E-49 in the FEIS.  AR 018761.

[15]The results of the delineation are also shown in Exhibit E-49.  AR 018761.

development would occur for any alternative alignment except at highway access points, AR 018504. (Punske Aff. ¶ 17, Exh. A). This decision will be made during the Section 404 permitting process, in conjunction with the USACE. Punske Aff. ¶ 18, Exh. A.

Plaintiff asserts that Defendants failed to consider wetlands-spanning bridges as a reasonable alternative that would avoid impacts to wetlands. Pl.'s Corr. Mot. Summ. J. 28. As already stated above, the FEIS did consider bridges as a means of avoiding environmental impact and plans to include such measures in the final design phase. *See* AR 018500 ("[p]reliminary design of the Preferred Alternative Alignment includes bridging stream crossings with portions of the wetlands and riparian forest adjacent to South Mayde Creek and Cypress Creek"); Punske Aff. ¶ 18, Exh. A.).

Finally, Plaintiff argues that Defendants violated NEPA by omitting a reasonably thorough discussion of mitigation measures, as required by law. Pl.'s Corr. Mot. Summ. J. 28; *Laguna Greenbelt,* 42 F.3d at 529. Specifically, Plaintiff asserts both that the FEIS fails to include any real description of mitigation measures, and that the wetlands mitigation discussion is too broad, too general, and otherwise insufficient. Pl.'s Corr. Mot. Summ. J. 29). Irrespective of these contradictory arguments, the Administrative Record contains sufficient evidence that mitigation measures were thoroughly considered throughout the NEPA process, including the time leading up to and including the completion of the FEIS. For instance, in September, 1999, the Executive Director of the Grand Parkway Association wrote to USFWS seeking input and assistance on wetlands identification and appropriate mitigation measures. Doc. No. 133, AR 003981. In addition, in 2000, Defendants received assurance from USACE that it would cooperate with Defendants to ensure NEPA compliance, especially with regard to "wetland and environmental issues, and compensatory mitigation." Doc. No. 218, AR 006913.

Within the FEIS itself, Defendants discussed wetlands mitigation measures as sufficiently

31

as possible given the extensive process involved in the construction of projects of this magnitude. AR 018499-AR 018504.  Nevertheless, the analysis considers measures that would be specifically appropriate for both regulated wetlands and non-regulated, non-wetlands natural resources such as the Katy Prairie and riparian habitats.  AR 018501.  Despite this cumulative assessment, Plaintiff are not satisfied with the extent to which mitigation plans are discussed, ignoring the fact that the FEIS is necessarily constrained in this regard.  As explained, the exact and appropriate mitigation measures to be undertaken become more apparent later during the design and construction phase of project development.  *See* AR 018500 ("Every effort has been made to avoid and minimize wetland impacts...to the extent practicable during the planning process.") *See* n. 4, *supra*.  At that point, a Compensatory Mitigation Plan developed with the help of natural resource agencies such as EPA, USFWS, and TCEQ is submitted to USACE as part of the Section 404 permit process.  AR 018500; AR 018504. Assuredly, this plan seeks to "provide a detailed discussion of mitigation commitments, including those that *must* be implemented during construction."  *Id*.  (emphasis added).

### F.    Defendants considered and disclosed all impacts as required by NEPA.

In the final two pages of its motion Plaintiff advances three very short sections claiming the FEIS failed to properly document and consider air impacts and safety risks.  This brief will try to be just as short in explaining why these arguments do not justify much consideration by the court.

### 1.    PM 2.5 was adequately considered and disclosed.

Plaintiff takes the FEIS to task for not disclosing measurements of what is referred to as PM 2.5.  This is shorthand for particulate matter that is emitted , in a minor amount (10%), from on-road diesel truck and gasoline engines. As of this time there is no requirement in any guidance from the Environmental Protection Agency ("EPA") or other Federal agencies to monitor PM 2.5 where an area is not judged to be in non-attainment.  In a summary section the FEIS specifically notes that:

> Pollutants required to be evaluated include CO and O3. As modeled, the Grand
> Parkway will not lead to increases in either of these pollutants. The Houston area is
> in attainment for all the criteria pollutants except for 8-hour O3. Segment E will not
> contribute to additional violations nor prolong attaining the NAAQS for O3. Segment
> E conforms to the emissions budget established for the approved 1-hour standard for
> ozone, but an 8-hour emissions budget has not been approved for the Houston area.
> The Houston area is not designated non-attainment for PM.

Doc. No. 624, AR 018473.

The FEIS spends a considerable number of pages talking about air quality and the subject of

mobile source air toxics, which includes PM 2.5.  *See* Doc. No. 624, AR 017982-AR 017990, AR

018053-AR 018053, AR 018375-AR 018382, and AR 018456-AR 018474.  This discussion is more

than sufficient under NEPA.

<h4 align="center">2. Air and health effects were adequately considered and disclosed.</h4>

This is one of the most difficult areas of analysis and is in the process of flux with more

information coming out. However, much is still unknown about the effects of air toxics on human

health.  With this "unknown" the FEIS deals with the subject in full accordance with NEPA:

> This document includes a basic analysis of the likely MSAT emission impacts of this
> project. However, available technical tools do not enable us to predict the project-
> specific health impacts of the emission changes associated with the alternatives in
> this document. Due to these limitations, the following discussion is included in
> accordance with Council on Environmental Quality (CEQ) regulations (40 CFR §
> 1502.22(b)) regarding incomplete or unavailable information.

Doc. No. 624, AR 018469.  The FEIS goes on to describe the potential issue and impacts with the

best information available.  *See* Doc. No. 624, AR 018469-AR 018474.

Plaintiff cites no rule, guidance or authority to show that the FEIS in any way violates NEPA.

The case cited in Plaintiff's motion, *Sierra Club v. United States Department of Transportation*, 962

F. Supp. 1037 (N.D. Ill. 1997), does not deal with the health effects of air toxics.  It only dealt with

the issue that the study conducted on project-related ozone was not included in the FEIS and also that

33

the agency based its analysis on one socioeconomic study that the court found to be deficient to analyze the true ozone producing effect of the project. *Id.* at 1045.

### 3. Greenhouse gas emissions were adequately considered and disclosed.

In December 2009, the EPA's Mandatory Reporting of Greenhouse Gases Rule became effective. The final rule was published on October 30, 2009, in the *Federal Register* with Docket ID No. EPA-HQ-OAR-2008-0508-2278. The rule requires reporting of greenhouse gas ("GHG") emissions from large sources and suppliers in the United States. However, CEQ has yet to issue any guidance on what will be required for Federal agencies in considering actions covered under NEPA. The court will note that the EPA rule became effective after issuance of the FEIS and ROD in this matter. Case law recognizes that no document would ever be completed under NEPA if the documents had to continually address new data and rules—especially for any issues or rules arising after the issuance of decisions. *See Sierra Club v. U.S. Dep't of Transp.,* 310 F. Supp. 2d 1168, 1203 (D. Nev. 2004), (*citing Marsh,* 490 U.S. at 373, 109 S. Ct. at 1859). Also, Plaintiff cites no requirements that greenhouse gases must be analyzed in an FEIS, and cannot as no such rule exists. Certainly, once CEQ issues any guidance, which may be out shortly for draft consideration, FHWA will comply on any future projects.

## II.  CONCLUSION AND PRAYER

The Administrative Record in this case clearly demonstrates that Defendants considered all impacts of this project and made extraordinary efforts to involve the public and keep them informed. The agency examined all reasonable alternatives and their potential impacts. Because Defendants in this case have not acted arbitrarily or capriciously in making their well-supported decision, and have taken the requisite "hard look," their decision should be affirmed.

WHEREFORE, based on the foregoing, Defendants respectfully pray that this Court grant

Defendants' Motions for Summary Judgment, dismiss this action, and grant Defendants all other relief to which they may be justly entitled.

Respectfully submitted,

GREG ABBOTT
ATTORNEY GENERAL OF TEXAS

C. ANDREW WEBER
FIRST ASSISTANT ATTORNEY GENERAL

DAVID S. MORALES
DEPUTY ATTORNEY GENERAL FOR
CIVIL LITIGATION
KRISTINA W. SILCOCKS
ASSISTANT ATTORNEY GENERAL
CHIEF, TRANSPORTATION DIVISION

_____s/Lisa Marie McClain_____
LISA MARIE MCCLAIN
ASSISTANT ATTORNEY GENERAL
Attorney-in-Charge
State Bar No. 90001724
Federal ID No 572948
STEPHEN L. TATUM, JR.
State Bar No. 24070721
Transportation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: (512) 463-2004/Fax: (512) 472-3855

ATTORNEYS FOR STATE DEFENDANTS,
TEXAS TRANSPORTATION COMMISSION AND
DEIRDRE DELISI, IN HER OFFICIAL CAPACITY
AS CHAIR OF THE TEXAS TRANSPORTATION
COMMISSION

OF COUNSEL:

KENNETH RAMIREZ
State Bar No. 16502200
Brown McCarroll LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701-4093
Phone: (512) 472-5456/Fax: (512) 479-1101

35

**For Federal Defendants:**

TIM JOHNSON
Acting United States Attorney

By:
_____s/ Jack F. Gilbert_____
JACK F. GILBERT
Special Assistant United States Attorney
Attorney-In-Charge for Federal Defendants
Texas Bar No. 00786946
60 Forsyth St., SW Suite 8M5
Atlanta, Georgia  30303-8814
Phone: (404) 562-3924/Fax: (404) 562-3702

LINDA J. AMIDON
Special Assistant United States Attorney
Florida Bar No. 0346871
60 Forsyth St., SW Suite 8M5
Atlanta, Georgia  30303-8814
Phone: (404) 562-3670/Fax: (404) 562-3702

ATTORNEYS FOR FEDERAL DEFENDANTS,
UNITED STATES FEDERAL HIGHWAY
ADMINISTRATION; JANICE W. BROWN, IN HER
OFFICIAL CAPACITY AS DIVISION
ADMINISTRATOR OF THE FEDERAL HIGHWAY
ADMINISTRATION, TEXAS DIVISION; JEFFREY
F. PANIATI, P.E., IN HIS OFFICIAL CAPACITY
AS ADMINISTRATOR OF THE FEDERAL
HIGHWAY ADMINISTRATION; UNITED
STATES DEPARTMENT OF TRANSPORTATION;
RAY LaHOOD, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF TRANSPORTATION OF THE
UNITED STATES DEPARTMENT OF
TRANSPORTATION

OF COUNSEL:

KEITH EDWARD WYATT
Assistant United States Attorney
Texas Bar No. 22092900
Federal Bar No. 3480
P.O. Box 61129
Houston, Texas 77208
Phone: (713) 567-9713 / Fax: (713) 718-3303

36

## CERTIFICATE OF SERVICE

I certify that on the 17th day of February 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following: Marisa Perales, LOWERRE, FREDERICK, PERALES, ALLMON & ROCKWELL, 707 Rio Grande, Ste. 200, Austin, TX 78701; Brad Rockwell, LOWERRE, FREDERICK, PERALES, ALLMON & ROCKWELL, 707 Rio Grande, Ste. 200, Austin, TX 78701; Jack F. Gilbert, Office of Chief Counsel, Federal Highway Administration, 60 Forsyth St. SW Suite 8M5, Atlanta, GA  30303-8814.

_____s/Lisa Marie McClain_____
LISA MARIE MCCLAIN
ASSISTANT ATTORNEY GENERAL